257 So.2d 388

**STATE of Louisiana**

**v.**

**Paul B. GLADDEN.**

**No. 51156.**

Jan. 17, 1972.

Rehearing Denied Feb. 21, 1972.

Barry F. Viosca, Allen C. Hope, Jr., Robert F. Fleming, Jr., New Orleans, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Jim Garrison, Dist. Atty., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.

SUMMERS, Justice.

By a bill of information filed on March 13, 1968 appellant was charged with the sale of a narcotic drug on November 3, 1967. La.R.S. 40:962. He was convicted and sentenced to serve twenty years at hard labor in the State Penitentiary. On this appeal he relies upon seven bills of exceptions for reversal of his conviction and sentence.

### Bill No. 1

On January 28, 1970, prior to trial on February 26, 1970, appellant filed a motion to quash, alleging that he had been denied a speedy trial contrary to the Sixth and Fourteenth Amendments of the United States Constitution and in contravention of Article I, Section 9, of the Louisiana Constitution. After a hearing the motion was denied, and this bill of exceptions was reserved. In his per curiam to this bill, the trial judge explained that the prosecution was instituted on March 13, 1968, and defendant's trial began on February 26, 1970, within the two-year period allowed for the commencement of prosecutions by Article 578 of the Code of Criminal Procedure, viz.:

Except as otherwise provided in this Chapter, no trial shall be commenced:

(1) In capital cases after three years from the date of institution of the prosecution;

(2) *In other felony cases after two years from the date of institution of the prosecution; and*

(3) In misdemeanor cases after one year from the date of institution of the prosecution.

The offense charged shall determine the applicable limitation. (Emphasis added.)

Clearly, under the circumstances of this case and the time allowed for commencing trial by the terms of Article 578 of the Code of Criminal Procedure, this trial was timely commenced within the two-year limitation prescribed for this offense. The time limitation does not commence, as defendant contends, from the date of incarceration. Instead, the two-year time limitation under this article is to be measured from the "date of institution of

prosecution," which is the date when the indictment is returned or the bill of information is filed.

On the other hand, Article 572 of the Code fixes the maximum time within which a person may be prosecuted, tried or punished for this crime at six years. Since this crime was committed on November 3, 1967, this trial was also timely under Article 572.

The basis for the trial judge's ruling, however, does not necessarily answer the contention that the accused was denied his constitutional right to a speedy trial.

The right to a speedy trial is a fundamental right under both the Federal and State Constitutions. It is a right with its roots in the very foundations of America's English law heritage. Evidence of the early recognition of this right to speedy justice is found in the Assizes of Clarendon (1166). The principle is enunciated in Magna Carta (1215) in these words: "We will sell to no man, we will not deny or defer to any man either justice or right." Sir Edward Coke wrote about the right in his Institutes. Coke's work was a basic study of every colonial lawyer in America. The history of the right to a speedy trial, and its reception in this country, mark it as one of our basic constitutional rights, preserved in the constitutions of all the States and of the Nation. Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

The constitutional right to a speedy trial has universally been thought essential to protect at least three basic demands of criminal justice in the Anglo-American system: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize anxiety and concern accompanying public accusation; and (3) to limit the possibilities that long delay will impair the ability of the accused to defend himself. United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

This right cannot be infringed by legislative enactments granting prolonged and unnecessary delays for the institution of prosecution or for the commencement of trial. U.S.Const. Amend. 6; La.Const. art. 1, §§ 6 & 9; La.Code Crim.Proc. art. 701. However, enactments fixing time limitation for prosecutions do serve to establish legislative recognition of the time that body has in all probability found to be reasonable delays for prosecutions. La. Code Crim.Proc. Ch. 1 of Title XVII.

In State v. Frith, 194 La. 508, 194 So. 1 (1940), this Court recognized that a speedy trial is one conducted according to fixed rules, regulations and proceedings at law, free from vexatious, capricious, and oppressive delay. In meeting these requirements the law does not exact impossibilities, or extra ordinary efforts, diligence, or exertion from the courts, or the representatives of the State; nor may the right to a speedy trial operate to deprive the State

of a reasonable opportunity of fairly prosecuting criminals.

From this record we learn that Gladden sold narcotics on the morning of November 3, 1967. According to the representation in the bill of exceptions, he was incarcerated in the Parish Prison (the Federal tier) on January 15, 1968. A bill of information was filed against Gladden on March 13, 1968. The bill of exceptions also represents that Gladden made a letter request on August 22, 1968 for a fair and speedy trial. There is, however, no attachment to support this allegation.

On September 13, 1968 Gladden was arraigned on six charges to which he pleaded not guilty. At some time after his arrest, Gladden was taken into custody by Federal authorities for violation of parole under a prior Federal conviction. A writ of habeas corpus ad prosequendum was issued to the U. S. Marshal on January 6, 1969 to produce Gladden in court for trial on January 15, 1969. On January 10, 1969 Gladden's counsel withdrew. When the case was called for trial on January 15, 1969, Gladden was without counsel and it was necessary for the court to refix the case for trial and appoint counsel to represent the defendant.

On February 10, 1969, when the case was again set for trial, Gladden's counsel moved for and obtained a continuance. Fifteen days were granted for filing pleas, and Gladden was again remanded to the U. S. Marshal.

In March 1969 the State obtained a writ of habeas corpus ad prosequendum issued to the United States Marshal in New Orleans directing the production of Gladden in court on March 14, 1969. On March 13, 1969 the case was again refixed "due to absence of the defendant who is presently held by the federal authorities," the Federal Marshal informing the court that he was unable to comply due to a shortage of deputies at the time.

On May 5, 1969 habeas corpus ad prosequendum was again issued to the U. S. Marshal, returnable May 15, 1969. On May 15 Gladden failed to appear for trial, being in the custody of Federal authorities in the State of Missouri. The case was again refixed. On October 30, 1969 habeas was again issued for trial of defendant on November 12, 1969. On the appointed day a question arose concerning defense counsel's appointment, and the court confirmed the appointment of defense counsel and refixed the trial date on December 11, 1969. Because he was then in Federal custody defendant was again absent on December 11, 1969 when his case was called. Counsel for defendant moved for a continuance on January 15, 1970 in order to file special pleadings. The continuance was granted.

Special pleadings were filed by defense counsel on January 28, 1970 and fixed for hearing. These motions were heard and

overruled on February 3, 1970. Trial commenced on February 26, 1970 and proceeded through February 27, 1970, at which time a guilty verdict was returned.

■ In our view, the State's prosecution of this cause was attended by delays, in large part, attributable either to Gladden's request for continuance or to the fact that he was in Federal custody and unavailable when the State was able to try him. There is no evidence that these delays were capricious or oppressive. Nowhere on this appeal has Gladden pointed to any prejudice which he suffered because of the delay in his trial, such as the loss of valuable witnesses. Cf. Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970).[1]

### Bill No. 2

As heretofore noted, Gladden was charged with six narcotic violations. Prior to trial he moved to consolidate these cases, alleging that all of these offenses resulted from one continuous transaction and should be joined in one count of a single indictment and tried together.

It is argued in support of the motion that there was only one defendant before the bar, only one narcotic agent involved and each of the six offenses occurred within a relatively short time—between October 25, 1967 and November 3, 1967.

The defense contention is predicated upon the proposition announced in Article 596 of the Code of Criminal Procedure that double jeopardy exists in the second trial when the charge in that trial is based on part of a continuous offense for which the defendant was in jeopardy in the first trial.

After a hearing on the motion it was denied and this bill was reserved.

■ In answer it is sufficient to say that defendant was prosecuted under only one of the six charges. The claim of double jeopardy is therefore premature. It will be time enough to urge this defense if and when the State should bring defendant to trial on one of the other charges.

■ Another argument presented to the trial court and advanced in this bill of exceptions relates to the defense contention that law enforcement officers violated defendant's rights when they did not arrest him after the first offense. If they had done so, it is said, the other offenses would not have occurred.

This argument is untenable. No law compels the police to arrest an offender at any given time, particularly when, as in this case, an undercover operation, further observation of the offender often results in the apprehension of additional offenders

---

1. In this connection, by a supplemental brief, Gladden claimed errors which are not apparent on the face of the record or supported by bills of exceptions. These contentions should properly be submitted in a post conviction remedy proceeding.

and discovery of the source of the contraband.

## Bill No. 3

Officer Frank T. Ben testified that he was employed by the Narcotics Division of the New Orleans Police Department as an undercover agent operating in the French Quarter area. In order to acquire an acquaintance with the drug traffic in the area and the persons involved, Officer Ben obtained employment as a short-order cook at Robert's Cafe on Toulouse Street.

In this small establishment he had an opportunity to become acquainted with customers. During January 1967 he became acquainted with defendant, a customer at the cafe. Defendant frequented the cafe until September 1967 when business fell off and the place was closed.

Ben again encountered defendant on October 18, 1967 at the Seven Seas Bar in the French Quarter. At this time defendant first offered to sell drugs to Ben or others he might know. With this encouragement, on October 25, Ben went to a hotel in the 1100 block of Decatur where he bought one capsule of heroin from defendant for $6.00. Again, on October 27, accompanied by an addict of his acquaintance, Ben made contraband drug purchases from defendant. He was accompanied by undercover Officer Faulkner on October 29 when another heroin and a demerol purchase was made from defendant. The sale

for which defendant was tried in this prosecution was made by him to Ben and Faulkner on November 3 in the usual location in the 1100 block of Decatur.

When Ben testified to the transaction of November 3 as the State's witness, he was cross-examined at length by defense counsel as to his role as undercover agent in the other transactions. While he was being cross-examined, he testified that he probably made purchases from others on the dates mentioned, which he could not recall unless he referred to his records which he did not have with him. He testified that some of these reports were probably in his possession; others, he said, were probably in Captain Giarrusso's possession for he submitted daily reports, some oral and some written, during his undercover operations.

Defense counsel then moved to have the reports made available for his perusal upon the authority of the Jencks decision. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). He argued in support of the motion that the reports "possibly are corroborative" of testimony before the court, and they could be used by counsel in going into the credibility of "any testimony" before the court concerning this particular matter. The State's attorney objected to the admission of these written reports, because purchases made from offenders other than the accused were immaterial and irrelevant and the reports were otherwise inadmissible un-

der Louisiana law. The Court denied the motion, and this bill was reserved.

The Jencks decision held that a criminal defendant in a federal prosecution was entitled to an order directing the government to produce directly to defendant reports made to the FBI by two government witnesses as to events and activities to which they had testified at the trial. The practice of producing government documents to the trial judge for his determination of relevancy and materiality, without hearing the accused, was disapproved. It was also held that if the government exercised its privilege to withhold the reports in the public interest, the criminal action must be dismissed.

Shortly following this decision, the 85th Congress in 1957 enacted the Jencks Act, Public Law 269 (18 U.S.C. § 3500). This legislation substantially lessened the impact of the Jencks decision upon the rights of defendants in federal criminal cases with respect to inspection of FBI records.

Moreover, the decision in the Jencks Case was not cast in constitutional terms; rather, the decision states rules of evidence governing trials before federal tribunals, and except in one instance, the principles announced there have not so far as we can ascertain, been extended to state criminal trials. United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); Sanders v. State, 278 Ala. 453, 179 So.2d 35 (1965); Mahone v. State, 120 Ga. App. 234, 170 S.E.2d 48 (1969); People v. Bellanca, 20 Mich.App. 1, 173 N.W.2d 754 (1970); State v. Smith, 431 S.W.2d 74 (Mo.1968); State v. Mascarenas, 80 N.M. 74, 451 P.2d 567 (1968), revd. on other grounds, 80 N.M. 537, 458 P.2d 789 (1969); State v. Page, 104 R.I. 323, 244 A.2d 258 (1968); Contra, People v. Sumner, 43 Ill.2d 228, 252 N.E.2d 534 (1969).

Refusal of the prosecution to produce the reports for perusal is relied upon by defendant as a withholding of evidence favorable to the defense which violates the rights assured an accused by the Due Process Clause of the Fourteenth Amendment to the Federal Constitution as announced in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Aside from the obvious fact that there has been no showing that any portion of the reports contained any evidence favorable to the defendant, we do not find the Brady Case applicable here. That case stands for the proposition that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

Underlying this holding is the principle that the business of the government is not to achieve victory but to establish justice. The principle is expressed in the idea that the government wins its point when justice is done in its courts.

Implicit in the Brady holding is the requirement that there be "known" perjured testimony used by the State or a deliberate deception; or that the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

■ Here defense counsel had plainly embarked upon a fishing expedition without having shown that the reports sought would establish evidence in his favor. His assertions that the reports would "possibly" corroborate testimony before the court, and that the reports could be used to inquire into the credibility of "any testimony" before the court concerning this "particular matter" are so vague and indefinite that they cannot serve to require the production of the reports. In the Jencks Case it was specifically stated that production would not be allowed for "any broad or blind fishing expedition among documents possessed by the Government on the chance that something impeaching might turn up."

■ It is also necessary to reject the defense contention that the Jencks Act (18 U.S.C. 3500) is applicable to this State court trial. By its very terms, the act applies "In any criminal prosecution brought by the United States . . . ." As the cases we have cited very plainly hold, this act of Congress applies only to federal prosecutions.

In Louisiana testimony to establish the credibility of a witness is not admissible until that credibility has been attacked. La. R.S. 15:484. See also La.R.S. 15:493.

■ Under this broad heading a well-established rule of evidence has been formulated in the jurisprudence. By this rule it is proper to refuse to order the production of a prior statement of a state witness, or, as in this case, written reports prepared by the witness, in the hands of the district attorney to be used by the defense to impeach the state witness where the defense has not established a proper foundation by showing that the contents of the statement sought are contrary to the sworn testimony of the witness.

The rule has been repeatedly reaffirmed. State v. Whitfield, 253 La. 679, 219 So.2d 493 (1969)·; State v. Bonner, 252 La. 200, 210 So.2d 319 (1968); State v. Martin, 250 La. 705, 198 So.2d 897 (1967); State v. Young, 249 La. 1053, 193 So.2d 243 (1967); State v. Cooper, 249 La. 654, 190 So.2d 86 (1966); State v. Sbisa, 232 La. 961, 95 So.2d 619 (1957); State v. Weston, 232 La. 766, 95 So.2d 305 (1957). Cf. State v. Rogers, 256 La. 447, 236 So.2d 795 (1970); State v. Manuel, 253 La. 195, 217 So.2d 369 (1969).

■ Ben's credibility has not been attacked and the State made no reference to the reports in its presentation in chief. No foundation showing inconsistencies in the reports and Ben's testimony was laid by the testimony of the witness Ben or by that of

any other person. It was, therefore, proper for the Court to refuse the motion to produce.

This bill is without merit.

### Bills Nos. 4, 5 and 6

These bills were reserved to the refusal to sustain defendant's objection to the admissibility of envelopes and contraband. The basis of the defense objection was that the evidence was not properly marked, and the State had failed to establish a sufficient chain of custody, possession, control and supervision to permit introduction of the evidence.

The objects which are the subject of this contention were identified as Exhibit S–1, an evidence envelope identified by Mr. John Koch, the forensic chemist; S–2, a small envelope identified by Captain Giarrusso and Officers Ben and Faulkner; S–3, a gelatin capsule identified as containing the opium derivative sold by defendant to Officer Ben; S–4, an evidence envelope; S–5, a small envelope; S–6, the contents of a capsule, being white powder in a white paper wrapping; S–7, an envelope; S–8, a small envelope; and S–9, contents of a capsule and some fragments of a gelatin capsule contained in a white paper wrapping. Exhibits S–1, S–2 and S–3 were introduced to prove the crime charged—a sale of narcotics on November 3, 1967. Exhibits S–4 through S–9 were introduced as proof of system and intent by showing sim-ilar transactions in which defendant sold narcotics to Officer Ben on October 25 and 27, 1967.

Undercover agent Ben testified that when he made the narcotic purchase in the presence of Officer Faulkner from the defendant on the night of November 3, 1967, he placed the capsule in his top left shirt pocket until he entered the Police Narcotics Office. At that time he displayed the capsule to Captain Giarrusso and turned it over to him for analysis. After a field analysis showed the substance in the capsule to be narcotics, Captain Giarrusso returned the capsule and its contents to Ben, who placed it in a small envelope, initialed it in his own handwriting, sealed the envelope and returned it to Captain Giarrusso.

Ben was corroborated in all respects by Officer Faulkner who was with him at the time and who also initialed the envelope. Captain Giarrusso also identified the envelope, which he too had initialed. After sealing the envelope (S–2) it was placed in a larger "evidence" envelope (S–1) and placed in the safe, Captain Giarrusso being the only person who had the combination.

The evidence envelope and its contents was delivered to Mr. John Koch in the crime lab on February 12, 1968. He noted on the envelope the date and time when it was received, which he signed. He assigned a case number to the envelope and made an entry in the evidence book main-

tained in the laboratory. Koch then made an incision across the face of the envelope with a knife to avoid breaking the wax seal, the evidence was removed, tested, replaced in the envelope, the incision being sealed with gumpaper. The large envelope with its contents was then placed in a small vault kept in the laboratory, the combination to which was known only to Mr. Koch. Extensive tests were conducted requiring that samples be extracted from the capsule. After these tests were completed, the capsule (S–3) was initialed by Mr. Koch and returned to the envelope. The other exhibits were handled in the same manner on different occasions.

Defense counsel's primary concern seems to be that Captain Giarrusso and Officers Ben and Faulkner did not initial the capsules as Mr. Koch did, and, therefore, proof that the capsules were the same ones obtained from defendant was not supported by proper authentication. Two of the capsules were crushed and unmarked. The testimony explained that the broken capsule was due to the drying out of the gelatin and not to any tampering or intentional alteration.

■ In our opinion a sufficient chain of custody, possession, control and supervision was established to permit the introduction of these exhibits. The alteration of the capsule itself by crushing was explained and this alteration was not material, for it had no effect on the narcotics which remained unchanged and available for analysis to verify or dispute the State's tests.

■ The chain of custody or connexity of the evidence is a matter for the jury to decide, so long as the objects introduced are shown to be reasonably connected with the defendant or the crime and have some relevancy which the trial judge considers sufficient to warrant their introduction into evidence. State v. McQueen, 257 La. 684, 243 So.2d 798 (1971); State v. Pesson, 256 La. 201, 235 So.2d 568 (1970); State v. Coleman, 254 La. 264, 223 So.2d 402 (1969).

■ The rule concerning the admission of objects, such as the capsules of heroin in this case, has required that a proper foundation be laid, and that the objects be identified or authenticated as the objects they purport to be, and shown to be connected with the crime or with the accused; however, the identification is not required to be absolute, certain or wholly unqualified, and where there is some evidence for this purpose, objections to its sufficiency go to the weight rather than the admissibility of the objects in question. 22A C.J.S. Criminal Law § 709 et seq., 29 Am.Jur.2d, Evidence § 774 et seq.

### Bill No. 7

The final bill was reserved to the overruling of defendant's motion for a new trial. As we understand the motion, it is based upon errors referred to in the bills of ex-

ceptions which we have considered and found to be without merit. For the reasons assigned to those bills of exceptions, this motion for a new trial is also without merit.

The conviction and sentence are affirmed.