**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Patrick H. WRIGHT, Jr, and William E. Armstrong, Defendants-Appellants.**

No. 85–4208.

United States Court of Appeals,
Fifth Circuit.

Aug. 18, 1986.

George M. Strickler, Jr., New Orleans, La., Thomas W. Davenport, Jr., Lavalle B. Salomon, Monroe, La., for Wright.

Mack E. Barham, David B. Girard, New Orleans, La., for Armstrong.

D.H. Perkins, Jr., Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before BROWN, JOHNSON and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Two attorneys appeal their convictions for violating the Hobbs Act, 18 U.S.C. § 1951, by conspiring to extort and by extorting money from a law firm and its clients in exchange for not prosecuting drunken drivers in city court in Monroe, Louisiana. The appeal presents us with the question whether there was sufficient nexus between the alleged extortionate crimes and interstate commerce to support this federal prosecution. The defendants argue that their acts had only an attenuated impact on interstate commerce, an interference so remote as to amount to no effect at all. We hold, however, that the alleged extortionate conduct was shown at trial to have an impact on interstate commerce sufficient to support a finding that the interstate commerce element of a Hobbs Act violation was proved by the prosecution. We also hold that the evidence adduced at trial was sufficient to convict the defendants of both a conspiracy and extortionate conduct in violation of the Hobbs Act. We therefore affirm.

## I.

The defendant Patrick Wright was City Attorney for Monroe, Louisiana. He hired the defendant William Armstrong as an

assistant city attorney. Wright resigned in July 1980 to enter private practice, while Armstrong remained assistant city attorney until he was removed in March 1984. Between late 1980 and mid–1983, Armstrong was the only assistant city attorney handling traffic offenses.

Wright's private practice included personal injury, real estate, domestic relations, and defense of "driving while intoxicated" (DWI) cases. He defended a large number of DWI cases that were prosecuted by Armstrong. Some of these cases went to trial, some ended with a guilty plea, and some resulted in "DA's probation" for Wright's clients.

"DA's probation" is a practice common in Monroe City Court whereby the city agrees to defer prosecution on the condition that the defendant avoids further trouble. After one year of DA's probation, the charges are generally allowed to prescribe. The decision to use DA's probation is discretionary with the city attorney.

The convictions of Wright and Armstrong resulted from allegations involving six of Wright's clients: Burns, Hill, Gohn, Newman, Tallant and Mathieu. The conspiracy count was proved with evidence relating to all six cases, while the substantive counts were proved with evidence from only the Burns case. In each of the six cases, the defendant was arrested and charged with DWI, but no prosecution occurred.

The Hill case was "nol prossed" after the charges were deemed to have prescribed. The Gohn, Newman, Tallant, and Mathieu cases were either reset or continued without date certain under DA's probation, and no further action was taken on them. The Burns case, however, was more complicated. An arrest warrant was sworn out for Burns in December 1980, but by March 1982, having not been executed, it was recalled by Armstrong. Service was never successfully made on Burns, and Armstrong recalled the warrant, ostensibly because the DWI charges against Burns had prescribed under La.Code Crim.Proc. art. 578 (West 1981).

When Burns heard that there was a warrant outstanding for his arrest, he contacted Armstrong concerning his situation. In the course of their conversation, Armstrong suggested that Burns retain a lawyer to institute a civil action for injuries sustained by Burns in the accident. Armstrong recommended several attorneys, including Wright. Burns retained Wright to represent him in a civil action and signed a one-third contingent-fee contract with Wright. Burns' lawsuit was filed in May 1981, and was handled almost entirely by Jack Wright, Wright's young associate. After the court ruled on a motion in limine and admitted the results of a blood alcohol test showing that Burns had been legally intoxicated at the time of the accident, the case was settled in June 1982 for $35,000.

After the settlement was agreed upon, Wright told Jack Wright that Armstrong was to receive a referral fee from the Burns case of approximately one-third of the attorney's fee. When Jack Wright protested this arrangement, Wright spoke to Armstrong about the size of the fee, and the two of them agreed that Armstrong should take $3,000. Burns received approximately $21,000 after expenses, and Jack Wright with co-counsel shared the remainder.

Eventually some complaint was made (by whom it is unclear), and Patrick Wright and William Armstrong were indicted for having violated the Hobbs Act, 18 U.S.C. § 1951, and for conspiring to violate the Act. All of the counts involved alleged extortion by the City Attorney's Office of Monroe, Louisiana, in connection with the prosecution of DWI cases in Monroe City Court. Both defendants were convicted in a bench trial on one count of conspiracy (Count IV), having waived their right to a trial by jury. Armstrong was additionally convicted on one count of a substantive violation, i.e., that under color of official right, he solicited and received from Wright $3,000 in return for preventing the DWI prosecution of Wright's client, Burns (Count V). Wright was convicted on one

count of aiding and abetting Armstrong in the substantive violation (Count VI).

The district court denied the defense motions for arrest of judgment and for a new trial. Wright and Armstrong were each sentenced to serve two concurrent two-year terms. Both Wright and Armstrong have filed timely appeals.

## II.

■ The first of the defendants' arguments on appeal is that the government has failed to establish that the extortion affected interstate commerce. By statutory definition, in order for the extortion to constitute a federal crime under the Hobbs Act, some connection must be established between the extortionate conduct itself and interstate commerce. 18 U.S.C. § 1951(a). "The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).[1] The interstate commerce connection is determined on a case-by-case basis.

Although the government raises several theories on appeal, the district court, in its judgment of conviction, relied on only one theory when it found sufficient effect on interstate commerce. Crediting expert testimony that local failure to prosecute DWI cases encourages more drunken driving, which jeopardizes highway safety by causing more accidents, and thus interferes with interstate travel on interstate highways, the district court found that "the

failure to prosecute DWI offenses in return for the payment of money adversely affected interstate commerce...." The defendants argue that this was error because the government did not prove that the acts alleged in the indictment had an impact or effect on interstate commerce. According to Wright and Armstrong, the government's theories on interstate commerce are based on speculation and are too attenuated to show a nexus between the criminal conduct and interstate commerce.

The Supreme Court has long recognized that the purpose of the Hobbs Act is to "use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery, or physical violence." *Stirone*, 316 U.S. at 215, 80 S.Ct. at 272. In addition, the Court has recognized that Congress intended to define as a federal crime conduct that it knew was already punishable under state law. *United States v. Culbert*, 435 U.S. 371, 379, 98 S.Ct. 1112, 1117, 55 L.Ed.2d 349 (1978). The legislative history indicates that Congress believed that the states had not been effectively prosecuting extortion that affected interstate commerce," and that the federal government had an obligation to do so." *Id.*, 435 U.S. at 380, 98 S.Ct. at 1117; 91 Cong.Rec. 11848, 11904, 11911, 11920 (1945).

■ The law in this circuit seems pretty clear that the impact on interstate commerce need not be substantial to meet the statutory requirement. All that is required is that commerce be affected by the extor-

---

1. The relevant language of the statute is as follows:

**Interference with commerce by threats or violence**

(a) Whoever in any way or degree *obstructs, delays, or affects commerce or the movement of any article or commodity in commerce,* by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

....

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State or territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951(a) and (b) (emphasis added).

tion "in any way or degree." *United States v. Sander,* 615 F.2d 215, 218 (5th Cir.1980); *United States v. Summers,* 598 F.2d 450, 454 (5th Cir.1979); *United States v. Chiantese,* 582 F.2d 974, 980 (5th Cir. 1978); *United States v. Amato,* 495 F.2d 545, 548 (5th Cir.1974); *United States v. Nakaladski,* 481 F.2d 289, 298 (5th Cir. 1973). *See also United States v. Hyde,* 448 F.2d 815, 836–37 (5th Cir.1971).

■ In the case before us, the district court relied on the testimony of a government witness, Robert Voas, qualified as an expert in the field of alcohol and highway safety. Mr. Voas testified that the consumption of alcohol is "a major, perhaps the major factor in causing highway accidents." His experience evaluating law enforcement techniques in the area of DWI led him to conclude that the more serious an automobile accident is, the more likely it is that a drinking driver is involved. Voas also testified that a person who has been arrested for DWI has a much greater chance of later being involved in a fatal accident than has a person with no DWI arrest or conviction record. It was Voas' opinion that the higher risk can be reduced either by treating the drinking driver or by suspending or revoking his driving privileges. Voas also testified that when the public becomes aware, either through the press or by word of mouth, that people arrested for DWI are not being prosecuted, then the deterrent effect of criminal sanctions is diminished. Failure to prosecute cases where the evidence is sufficient to sustain a conviction has a demoralizing effect on police officers to the point that they tend to make fewer arrests. Finally, Voas testified that alcoholism is a tremendous problem in the United States, costing the nation one hundred billion dollars per year in medical expenses and lost working time, and that people with drinking problems who finally do seek help often do so because they have been arrested and prosecuted on a charge of drunk driving.

The district court, clearly acting within its prerogative, credited this testimony, and relied on it to find that the government had proved the interstate commerce element of a Hobbs Act crime. Once the conclusion of this expert is accepted, the defendants' argument that the government has overreached itself by prosecuting acts having an insufficient nexus with interstate commerce must be rejected. The district court's findings to support its conclusion on interstate commerce are not clearly erroneous, and we are powerless to disturb them. *See United States v. Dayton,* 604 F.2d 931, 940 (5th Cir.1979) (en banc), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980) (general agreement that the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) is to be applied to findings by judges in criminal proceedings where a jury has been waived) (citing 2 C. Wright, *Federal Practice and Procedure* § 374 (2d ed. 1982)). *See also United States v. Penn,* 721 F.2d 762, 765–66 (11th Cir.1983).

Finally, we note that the government introduced evidence on other theories of interstate commerce to support its contention that the defendants' actions are within the scope of the Hobbs Act. The defendants argue that because these other theories were not alleged in the indictment, the district court erred by allowing the government to amend, in effect, the indictment by attempting to prove an interstate commerce connection not alleged in the indictment. We find it unnecessary to address this contention of the defendants because the district court, in its judgment of conviction, relied only on evidence relevant to the commerce connection that was alleged in the indictment. Because this evidence was relied on by the district court to support the defendants' convictions, it is irrelevant that the government adduced extraneous evidence on the interstate commerce issue.

### III.

We next consider whether the evidence adduced at trial is sufficient to prove extortion within the meaning of the Hobbs Act, that is, to support the Count V conviction of William Armstrong of soliciting and receiving, under color of official right, $3,000 from Wright and his law firm to prevent

the DWI prosecution of Wright's client, Burns.

■ A conviction under the Hobbs Act may be sustained by a finding that a public official has taken a fee, unlawfully, under color of his public office, in return for performance or nonperformance of an official act. There is no requirement that threat, force, or duress be proved when the defendant is a public officer. *United States v. Williams*, 621 F.2d 123, 124 (5th Cir.1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). "The coercive element is supplied by the existence of the public office itself." *Id.* at 124; *see also United States v. Sorrow*, 732 F.2d 176, 179–80 (11th Cir.1984).

The defendants here are attacking their convictions on the grounds of insufficient evidence. The district court, noting that Armstrong had referred Burns to Wright, concluded from the evidence that Armstrong's withdrawal of the warrant for Burns' arrest was the result of Wright's agreeing to pay a fee to Armstrong. Armstrong and Wright argue that the evidence does not support the district court's conclusion in this regard, claiming that the decision was made not to prosecute Burns because the results of his blood alcohol test would have been inadmissible at a criminal trial, that the charges against Burns had prescribed, and that the money Armstrong received from Wright was a routine referral fee paid pursuant to settlement of the Burns civil case.

### A.

The district court found that Armstrong did recall Burns' arrest warrant and that

Armstrong "made different excuses at different times as to why he took the action." Armstrong argues on appeal that he decided not to prosecute Burns because the blood alcohol test results showing Burns' intoxication would not have been admissible at Burns' DWI trial. The blood alcohol test results were not admissible, Armstrong contends, because such tests are valid only if the subject of the test has been "arrested" at the time of the test, *see* La.Rev.Stat.Ann. § 32:661 (West supp. 1986),[2] and Burns was not under arrest at the time the test was given. We are therefore confronted with the meaning of arrest as used in this statute.

The Louisiana Code of Criminal Procedure, article 201, defines arrest as follows:

Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him.

La.Code Crim.Proc.Ann. art. 201 (West 1967 and supp. 1986). The statutory definition of "arrest" is thus tied to the concept of restraint. The circumstances indicating intent to effect an extended restraint on the liberty of the accused, rather than the precise timing of an officer's statement, "You are under arrest," determines when the arrest is actually made. *State v. Sherer*, 354 So.2d 1038, 1042 (La.1978); *State v. Marks*, 337 So.2d 1177, 1182 (La.1976).

In *State v. Sherer*, 354 So.2d 1038, the Louisiana Supreme Court expressly ad-

---

**2.** The relevant paragraphs of section 32:661 of the Louisiana Revised Statutes Annotated provide as follows:

A. Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of R.S. 32:662, to a chemical test or tests of his blood, breath, urine or other bodily substance for the purpose of determining the alcoholic content of his blood *if arrested* for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while believed to be under the influence of alcoholic beverages.

The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle upon the public highways of this state while under the influence of alcoholic beverages. ....

B. Any person who is dead, unconscious or otherwise in a condition rendering him incapable of refusal shall be deemed not to have withdrawn the consent provided by Subsection (A) of the section, and the test or tests may be administered subject to the provisions of R.S. 32:662.

dressed the situation of a blood alcohol test having been administered to an unconscious driver. *Sherer* held that in Louisiana an individual who is unconscious, in need of medical care, and obviously incapable of escape as the result of an automobile accident is "arrested" for the purposes of a blood alcohol test when a law enforcement officer evidences a clear intent to effect a restraint on the individual. In *Sherer*, the police officer at the scene of the accident told the ambulance driver that he was "placing charges" against Sherer because physical evidence indicated that Sherer had been driving while intoxicated. He also instructed the ambulance driver to obtain a blood alcohol test on Sherer. The defendant in *Sherer* remained unconscious at the hospital, "a condition rendering him incapable of refusal to submit to the alcohol blood test." The court held that the blood test was permissible and that the results of the blood test on the unconscious defendant had been properly admitted. Because it was not possible to detain Sherer anywhere other than a hospital without jeopardizing his health, and because there was no need to detain him any further since he was already unconscious and incapable of escape, the court held that the testing was done while the defendant was under "arrest" within the meaning of section 32:661. *Sherer,* 354 So.2d at 1042.

Burns' situation in the case before us is comparable to that of the driver in *Sherer*. Burns was rendered unconscious in the automobile accident. The law enforcement officer at the scene evidenced a clear intent to restrain Burns by following the ambulance to the hospital, and, once there, requesting that a blood alcohol test be done on Burns. Perhaps there was no ordinary arrest in the usual sense of the word. It obviously would have been pointless to Mirandize and take to the police station an unconscious person. Nevertheless, *Sherer* tells us, Burns was under "arrest" within

the meaning of section 32:661 when the blood test was taken at the hospital. In addition, again similar to the situation in *Sherer,* Burns remained unconscious for a time at the hospital, and was incapable of refusing to submit to the blood alcohol test. "Hence, under La.R.S. 32:661(B), his implied consent was not withdrawn; and the testing was permissible." *Id.*

Under *Sherer,* then, the results of Burns' blood test would most likely have been admissible at his DWI trial. We therefore hold that the district court did not err in discrediting Armstrong's given rationale for "nol prossing" Burns, that is, that the blood test results would have been inadmissible at Burns' criminal trial.[3]

### B.

Armstrong's next argument concerns the significance of the withdrawal of the Burns arrest warrant. The evidence shows that in late February 1982, Burns' arresting officer, having recently learned Burns' correct home address, tried to retrieve the arrest warrant from police files in order to serve it on Burns. Officer Otwell could not locate the warrant, however, and was informed by Armstrong that it had been recalled because the statute of limitations had run on it. Armstrong admits that he had the Burns warrant withdrawn, but claims to have done so only after the charges against Burns had prescribed. Article 578(3) of the Louisiana Code of Criminal Procedure provides that *"no trial shall be commenced.... (3) In misdemeanor cases after one year from the date of institution of the prosecution...."* La. Code Crim.Proc.Ann. art. 578(3) (West 1981) (emphasis added). Armstrong cites this provision in support of his argument that the time limit on prosecution of the Burns case prescribed in December 1981, one year after the arresting officer filed his affidavits with the city court clerk. He

---

**3.** Wright argues that *Sherer* is distinguishable because the attending police officer in Burns' case did not swear out an arrest warrant until after he had the test results. The *Sherer* court, however, does not indicate when the arrest warrant for Sherer was sworn out, and we decline to distinguish the two cases on grounds that appear to have been irrelevant to the Louisiana Supreme Court.

argues that this point demonstrates that it was because of prescription, not because of corruption, that he did not prosecute Burns.

The district court found, however, that the one-year period begins to run not when an arrest affidavit is filed, but when a prosecution affidavit is filed at arraignment. Since no such affidavit had been filed in Burns' case, the court found that prosecution was never instituted under article 578(3); the one-year period thus never began to run and therefore could not have prescribed. Armstrong contends, and the dissent agrees, that the Burns prosecution was instituted when Officer Otwell filed his arrest affidavit in December 1980, and that therefore when Armstrong ordered the Burns arrest warrant withdrawn in early 1982, the one-year limitations period on the prosecution had prescribed.

We find it unnecessary to determine when the one-year limitations period began to run because, when considered in the context of all of the evidence, we do not view it as a critical consideration in assessing Armstrong's guilt or innocence. Even if we assume that the statute barred the prosecution of Burns in February 1982 when Officer Otwell first noticed the warrant was missing, there remains the failure to prosecute between December 1980 and December 1981 that is less than fully explained by Armstrong. The case languished in the files for at least a year with little or no action by Armstrong. Furthermore, there is no evidence that Armstrong withdrew the Burns warrant in the course of a routine purging of the outstanding warrants or that it was a practice for him personally to order the withdrawal of all time-barred warrants from the files. The evidence supports the conclusion that Armstrong accorded special treatment to that particular warrant.

■ In reviewing the sufficiency of the evidence to support a criminal conviction, we are obligated to view the evidence in the light most favorable to the government. *United States v. Bi-Co Pavers, Inc.*, 741 F.2d 730, 737 (5th Cir.1984). Thus, even if

the warrant was withdrawn after December 1981, and even if the one-year period had prescribed by February of 1982, we deem this to be of little significance in evaluating the strength of the government's case because of the other incriminating inferences that may be drawn from the entire set of facts. Irrespective of whether Burns' prosecution was time-barred in February 1982, Armstrong's overall handling and treatment of the Burns case fully supports the district court's ultimate conclusion that Armstrong was guilty of the crimes charged beyond a reasonable doubt.

## IV.

The question whether the evidence is sufficient to prove Count VI of the indictment, that Patrick Wright aided and abetted William Armstrong in his extortion of money from Wright's law firm and clients, is easy to resolve.

Wright argues that as the payor of the extorted money to Armstrong, he may not be convicted of aiding and abetting or of conspiracy to violate the Hobbs Act without proof that he initiated and actively procured the violation. Wright appears to argue that because he is the one who actually made out the check to Armstrong, he is a victim of the extortion. As the payor, his argument goes, he may not be convicted of aiding and abetting the extortion unless it is shown that he "actively induced and solicited" the extortion on the part of Armstrong. For this proposition, Wright relies on *United States v. Nelson*, 486 F.Supp. 464 (W.D.Mich.1980).

■ Even if we were to adopt this analysis, Wright's argument on this point fails for two reasons. First, the evidence indicates that Wright did aid and abet Armstrong's extortion by actively inducing and soliciting the payment to Armstrong. He was the one who initially informed Jack Wright that Armstrong was to receive a payment of one-third of the attorney's fees. After hearing complaints about this arrangement from Jack Wright, it was the

defendant Wright who requested and convinced Armstrong to take a lesser amount from the fees. By convincing Armstrong to take the lesser fee, and by soliciting and inducing Jack Wright to pay it, Pat Wright aided and abetted Armstrong's extortion of the law firm.

In addition, we find no support for Wright's argument that he is to be viewed as a victim of Armstrong's extortionate conduct. Wright and Armstrong conspired together to extort money from Wright's law firm. Although Wright actually made out the $3,000 check to Armstrong, it was Wright's law firm that was the real payor. Thus, even if we were to follow Wright's suggestion that we adopt the *Nelson* rule for this circuit, which we do not do today, that rule would not work to the benefit of Wright. His conviction on Count VI stands.[4]

### V.

■ Armstrong next argues that the district court erred by admitting into evidence extra-judicial statements, alleged to have been made by Patrick Wright, without the government's having established by a preponderance of evidence independent of those statements that an illegal conspiracy existed between Armstrong and Wright. Wright makes the same argument in reference to out-of-court statements made by Armstrong. We are guided by the rule that a declaration by one defendant is admissible against another defendant only when there is a sufficient showing, by independent evidence, of a conspiracy among the defendants, and when the declarations at issue were made in the course of and in furtherance of the conspiracy. *United States v. James*, 590 F.2d 575, 581 (5th Cir.1979) (en banc); Fed.R.Evid. 801(d)(2)(E).

The district judge relied on the following evidence when making his finding of a conspiracy: Wright gave Armstrong a check for $3,000 in June 1982, after the Burns charges were dropped; unlike most other Wright account checks, there was no notation on the $3,000 check as to its purpose; neither Burns nor anyone in Wright's law firm was aware of any referral fee arrangement with Armstrong; the files on four DWI offenders, Gohn, Newman, Tallant, and Mathieu, who were represented by Wright, were missing from the Monroe City Attorney's office in March 1984 when Armstrong was removed from office.

■ Proof of a conspiracy does not require direct evidence of an actual agreement between the co-conspirators, but may be inferred from circumstantial evidence. *United States v. Reed*, 715 F.2d 870, 874 (5th Cir.1983). The district court found the evidence sufficient to support a finding of conspiracy. Our standard of review for

---

**4.** Wright also argues that the district court abused its discretion under Fed.R.Crim.P. 16 by refusing to admit certain evidence offered by the defense. Wright claims that not until the close of the government's case was he informed that the government intended to introduce five of his office files as support for the conspiracy charge. The government's theory was that the meager contents of those files indicated that Wright did not intend to try those cases, and that this was circumstantial evidence of Wright's knowledge that the cases in question would not be prosecuted. Wright admits that he knew the government planned to introduce some of his office files, but complains that he was unaware of the government's theory regarding the files until just before the government rested.

When Wright then moved for the admission of all the remaining 1983 DWI files from his office, ostensibly to show that they, too, were

"thin" files, the district court ruled them inadmissible because they had not been shown to the government before it rested its case, and because they were quite possibly unreliable items of evidence. We find no error in the district court's ruling. We note especially that Wright knew prior to trial that the government planned to introduce several of the relevant files from his office. Wright does not claim that he was denied the pretrial opportunity to tender, for later introduction into evidence, any of his DWI office files. We also note that because the office files that Wright sought to introduce were solely within his control during the entire trial, up to and including the morning after the government rested its case, it was not an abuse of Rule 16 discretion for the district court to question the reliability of such evidence and deny its admission on that ground. We therefore find no merit to Wright's arguments on this point.

insufficiency of the evidence is whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. The fact-finder may choose among reasonable constructions of the evidence. *United States v. Carpenter,* 769 F.2d 258, 259 (5th Cir.1985). "The evidence and the inferences drawn from it are viewed in the light most favorable to the government." *Id.* Viewing the case as a whole, we find that the independent evidence was sufficient to support the judge's finding of conspiracy between Wright and Armstrong, and that it was not error to admit the statements of either to be used as evidence against the other.

## VI.

We affirm the district court's finding a nexus between interstate commerce and the defendants' extortionate conduct sufficient to sustain federal prosecution. We also agree with the district court that the evidence adduced at trial was sufficient to support the convictions of each defendant for his respective violations of the Hobbs Act. The judgment of the district court is

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting.

This is a case that ought never to have been brought, certainly not in the United States District Court. It involved conduct by two Louisiana lawyers that would merit severe disciplinary action by either the Louisiana Bar or the Louisiana courts, or both. And, indeed, it was the revulsion of the distinguished District Judge to these flagrant transgressions of elemental legal ethics that brought down his strong condemnation in the form of a conviction for violation of the Hobbs Act because of the interference of these local activities with interstate commerce.

Critical to the judge's factual finding of federal culpability was his rejection of Armstrong's insistence that the reason he, the prosecutor, declined further prosecution was that prosecution was prescribed under the Louisiana one year time limit.

My analysis demonstrates that the judge was flatly wrong on this question of Louisiana law.

Here, Armstrong strenuously urged that the reason he recalled Burns' arrest warrant was, not because of any payment or the expectation of any payment from Wright, but because the case against Burns had prescribed under the Louisiana law which requires prosecution within one year. The trial judge, himself experienced as a Louisiana practitioner followed by years as a Louisiana United States District Judge, rejected this out of hand on what turns out to have been a flagrant error in Louisiana law.

Unlike the possibility of an ordinary error in state law which would likely not adversely affect the Court's judgment, this case is much different. Had the judge, in this judge trial, not made this critical error—had he realized that prosecution was indeed barred—it is clear the judge could not have found these attorneys guilty beyond a reasonable doubt.

In its effort to prove a substantive violation of the Hobbs Act, the government placed all of its prosecutorial eggs in the basket of William Burns' DWI prosecution, or more accurately, the lack thereof. Unfortunately, the government, the District Court, and now the majority overlook the fact that Burns' DWI prosecution was prescribed as a matter of law through the combined operation of La.C.Crim.Proc. arts. 578(3), 382, and 385. With Armstrong's valid argument for not prosecuting Burns, the government's entire case unravels.

La.C.Crim.Proc. art. 578(3) states that "[e]xcept as otherwise provided in this Chapter, no trial shall be commenced ... [i]n misdemeanor cases after one year from the date of institution of the prosecution." (West 1981). The Court's opinion concludes that the one-year statute of limitations contained in article 578(3) never began to run because Burns' prosecution was never instituted. I disagree.

La.C.Crim.Proc. art. 382 spells out the various methods of instituting criminal prosecutions.

A prosecution for an offense which may be punished by death shall be instituted by indictment by a grand jury. Other criminal prosecutions in a district court shall be instituted by indictment or by information. A prosecution for violation of an ordinance shall be instituted by affidavit. Other criminal prosecutions in a city court and prosecutions in a parish court shall be instituted by affidavit or information. Criminal prosecutions in a juvenile court or family court shall be instituted by affidavit, information, or indictment.

(West 1981). Under the plain terms of article 382, any prosecution of Burns in the Monroe City Court would have to be instituted by information or affidavit. Article 385 defines affidavit as "a written accusation of crime made under oath and signed by the affiant. It must be filed in open court in a court having jurisdiction to try the offense, *or in the office of the clerk thereof.*" La.C.Crim.Proc. art. 385 (West 1981) (emphasis added). *See State v. Kimble,* 411 So.2d 430, 433 (La.1982) (accusations in traffic ticket printed in affidavit form may be sufficient to institute prosecution if made under oath or sworn to); *City of Pineville v. Robinson,* 260 La. 415, 256 So.2d 427 (1972) (affidavit form traffic ticket instituted prosecution where properly sworn to, subscribed before the clerk of the court, and contained sufficient information to inform the accused of the nature of the offense charged).

The record reveals that Patrolman Herbert Otwell of the Monroe Police Department executed arrest and prosection warrants of William Burns on December 3, 1980. The warrants were sworn under oath and signed by Patrolman Otwell. They were filed with Frances O'Neal, a commissioned Deputy Clerk of the Monroe City Court. The statutory requirements for instituting Burns' prosecution were met on December 3, 1980, and the one-year prescriptive clock began ticking on that date. When Armstrong ordered the arrest warrant of Burns withdrawn in March 1982, much more than one year had passed since the prosecution was instituted. The prosecution was therefore prescribed.

The Court's opinion erroneously relies on *State v. Jones,* 443 So.2d 639 (La.App. 1983), and *State v. Gladden,* 260 La. 735, 257 So.2d 388 (1972), for the proposition that only the filing of a bill of information or the return of a grand jury indictment is sufficient to institute a prosecution. For a criminal prosecution in Louisiana District Court—such as was involved in both *Jones* and *Gladden*—an information or indictment is required; the second sentence of article 382 says as much. But the fourth sentence of article 382 says that a criminal prosecution in city court may be instituted by affidavit. The courts in *Jones* and *Gladden* were not faced with a criminal prosecution in city court and their holdings cannot be interpreted to override the unambiguous statutory language of article 382.

I also write separately to express my inability to accept the presence of this prosecution in federal court. The tawdry activities brought to light at trial were undoubtedly unethical, probably criminal, and should not be tolerated in a democratic society. But not every case of small-town corruption is an appropriate target for federal prosecution, and the Hobbs Act appears to be a particularly inappropriate vehicle for the present prosecution.

The case law under the Hobbs Act requires that it is the illegal act—here the extortion—which must affect interstate commerce. *See United States v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978) ("more than a speculative attenuated 'one step removed' kind of effect"). I do not take issue with the Court's conclusion that only a minimal connection between the extortion and the effect on interstate commerce is required, but the tenuous connection between "fixed" DWI prosecutions in Monroe, Louisiana and interstate commerce in this case strains even the sturdy lines with which we suspend the legal fictions termed "interstate commerce analysis." Since it

must be the effect which the *extortion* has on interstate commerce, not all of the far-fetched contingent consequences, I think we should sound once and for all to United States Attorneys and District Courts not to reach out to the Hobbs Act to bring every crooked small-town officeholder to justice.