COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

VERSUS

RICKY JOSEPH LANGLEY


**********


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 10258-02
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE


**********


ELIZABETH A. PICKETT
JUDGE


**********


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and
Elizabeth A. Pickett, Judges.

### CONVICTION AFFIRMED. REMANDED WITH INSTRUCTIONS.

John Foster DeRosier
14th JDC District Attorney
Carla Sue Sigler
Assistant District Attorney
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
Counsel for State of Louisiana

Anna Van Cleave
Richard Bourke
Louisiana Capital Assistance Center
636 Baronne St.
New Orleans, LA 70113
(504) 558-9867
Counsel for Defendant:
Ricky Joseph Langley

**PICKETT, Judge.**

## FACTS

On Friday, February 7, 1992, the Calcasieu Sheriff's Office received a 911 call from the mother of six-year-old Jeremy Guillory reporting him missing. The call was placed from the home of Ricky and Rosie Lawrence, where they lived with their two small children. Ricky Langley, the defendant, rented a room in the house from the Lawrences and had been living there for approximately three weeks.

Deputies were dispatched to the scene. A massive search ensued and continued through the weekend. When it became apparent to law enforcement that Jeremy had not just wandered off, they began a criminal investigation. In the course of the investigation, it was discovered that there was an outstanding warrant for the defendant from the State of Georgia for a parole violation.

On Monday, February 10, 1992, the defendant was arrested on the Georgia warrant at his place of employment. He was taken into custody by Calcasieu Parish Detective Donald DeLouche and FBI Special Agent Donald D. Dixon. Detective DeLouche advised the defendant of his *Miranda* rights. After placing him in an FBI vehicle, Special Agent Dixon advised the defendant that in addition to being arrested for the Georgia parole violation, he was a suspect in the disappearance of Jeremy Guillory. Agent Dixon then asked the defendant if he had killed Jeremy Guillory, and the defendant admitted that he had killed Jeremy. The defendant advised Special Agent Dixon that Jeremy's body was in the closet of the bedroom that he rented from the Lawrences. He admitted that he had choked Jeremy.

The Lawrence home was secured as a crime scene. Both the defendant and Mrs. Lawrence executed volunteer search forms. The defendant accompanied the law

1

enforcement officials to the Lawrence home. The defendant was again advised of his *Miranda* rights, which he agreed he understood and which he waived. He voluntarily walked the officials through the crime scene, describing in detail how he had killed Jeremy. Jeremy's body was discovered in the closet of the defendant's bedroom, covered with blankets. Jeremy had a ligature around his neck and a sock stuffed into his mouth, consistent with the details the defendant had given the officers when describing how he had killed Jeremy. The cause of death was ultimately determined to be asphyxiation.

The defendant was then taken to the Calcasieu Parish Sheriff's Office, where he gave a videotaped statement. The defendant was again advised of his *Miranda* rights, and he expressly waived those rights. He told the officers he first met Jeremy Guillory approximately one week before the homicide when Jeremy was at the Lawrences' home playing with the Lawrence children. The defendant said when he first saw Jeremy, he "wanted him" and that he wanted to molest him. On the Friday that he killed Jeremy, Jeremy was at the house playing with the Lawrences' son, but Jeremy left when Mrs. Lawrence and her son left to visit a relative. Jeremy later returned with his BB gun while the defendant was at the house alone, and asked if his friend was there. The defendant said he could come in and visit. Jeremy came into the house and put his BB gun down in the front room. The defendant said he knew then that he would "mess" with the child unless the child left immediately or someone came home. The defendant related that he went upstairs and Jeremy followed him and went into one of the children's rooms to play. He stated that while Jeremy was playing he came up behind him, put his arm around his neck, lifted him off the floor, and choked him. The defendant said he knew he was going to kill him. He gave the

2

officers detailed information about the incident, including the fact that Jeremy was kicking and his boots came off. The defendant said he felt enjoyment while he was choking Jeremy. He said when Jeremy quit moving he carried him to the defendant's bedroom and laid him on the bed. He said he put his penis in the child's mouth and ejaculated. The defendant left Jeremy there and went about his task of doing laundry. He said at some point Jeremy was making noises and the defendant then put a ligature around his neck and choked him, pulling the ligature as hard as he could. He then tied the two ends of the cord together and stuffed a sock in Jeremy's mouth.

Jeremy's mother came to the house looking for him. The defendant told her he had not seen him. He offered to let her use the phone. While she was there he realized that Jeremy's BB gun was still in the front room. When she left, he picked up the gun and took it upstairs, where he put it in his bedroom closet. Jeremy's mother returned to the house. The defendant offered to help her search and allowed her to use the phone to call 911. He later called 911 himself to make sure they had the correct address.

The defendant stated that people started to arrive to help with the search. The defendant then took Jeremy's body and put it in the closet, and retrieved Jeremy's boots from the child's room where he had been choked and put them in the closet. At some point, he covered the body with blankets from his room. He said he mopped his room and the hallway. He changed the sheets on his bed and washed the blankets. He denied that he was trying to destroy evidence.

On March 26, 1992, at the defendant's request, a second videotaped statement was taken from the defendant. The defendant was again advised of his rights. He acknowledged that he was being represented by an attorney but stated he did not want

3

his lawyer present and expressly waived his rights, including his right to counsel. He told the officers that some of the details in his first statement were incorrect and he wanted to give them a correct account of the events of the day he killed Jeremy Guillory.

The defendant related that, on the day in question, Jeremy came back to the house to play with the Lawrences' child. He said he told Jeremy the child was not home but invited him in. Jeremy declined and went off to shoot his BB gun. The defendant said he thought about the fact that no one else was at the house and that he could do what he wanted to do. He stated he went to the back door and called Jeremy, inviting him inside, and Jeremy then came inside. The defendant said he went straight upstairs and Jeremy followed him. He stated he then went back downstairs and Jeremy followed him. The defendant said he pulled the child's pants down to molest him — to sodomize him — to "go all the way" with him — but he couldn't do it. He pulled Jeremy's pants back up, turned him around, and forced his penis into Jeremy's mouth. The defendant said he ejaculated but didn't know if it went into Jeremy's mouth. The defendant said he knew what he was doing was wrong but that he had no control over it. He said he then carried Jeremy upstairs to his own bedroom, not the children's, and choked him like he told them in the first statement — with his arm around Jeremy's neck. When Jeremy went limp, he laid him on his bed. The defendant went downstairs, and when he came back Jeremy was making heavy breathing noises. The defendant said that is when he put the ligature around Jeremy's neck and pulled as tightly as he could, but that did not stop the child from trying to breathe. He then stuffed an old sock in Jeremy's mouth to make sure he stopped breathing. He told the officers the remainder of his first statement was

4

accurate. He agreed that he knew what he did was wrong. He stated that he had remorse for the fact that a child's life was lost, but that he felt no regret for "what's done."

A seminal stain was found on the seam of the underside of one of the sleeves of the t-shirt that Jeremy was wearing when his body was found. It was identified by DNA analysis as being semen from the defendant. The semen was soaked into the fabric.

The 1994 Trial

A review of the defendant's conviction for second degree murder and the issues in this appeal requires a review of the prior proceedings in this case. The defendant was indicted by a grand jury for the offense of first degree murder. In 1994, he was found guilty of that charge and sentenced to death. His conviction was appealed to the Louisiana Supreme Court, and both the conviction and sentence were affirmed. The supreme court, however, granted the defendant's application for rehearing and ultimately remanded the case to the trial court for an evidentiary hearing concerning the defendant's claim of intentional discrimination in the selection of the grand jury foreperson. *State v. Langley*, 95-1489 (La. 4/14/98), *rehearing granted in part* (6/19/98), 711 So.2d 651 (hereinafter *Langley I*). On remand, the trial court granted the defendant's motion to quash the indictment and vacated his conviction and sentence. The state appealed that judgment, and it was affirmed by the supreme court. *State v. Langley*, 95-1489 (La. 4/3/02), 813 So.2d 356.

The 2003 Trial

The defendant was re-indicted on a charge of first degree murder and pled not guilty and not guilty by reason of insanity. A change of venue was granted because

5

of pretrial publicity. Although the case was tried in Calcasieu Parish, the jury was selected from Orleans Parish. The jury rejected the defendant's insanity defense and returned a verdict of guilty of the lesser included offense of second degree murder. The defendant received the mandatory sentence of life imprisonment at hard labor. The defendant appealed the verdict and argued that the temporary absences of the trial judge from the courtroom during portions of the *voir dire* examination of prospective jurors and during closing arguments constituted a structural defect in the proceedings and required the reversal of his conviction. This court agreed that "the errors committed by the trial judge, in absenting himself from the proceedings and failing to maintain decorum, were structural errors requiring reversal of the defendant's conviction without a showing of actual prejudice." *State v. Langley*, 04-269, p. 15 (La.App. 3 Cir. 12/29/04), 896 So.2d 200, 210 (hereinafter *Langley II*). This court further concluded that the structural defects rendered the jury's verdict absolutely void and resulted in neither a conviction for second degree murder nor an acquittal of first degree murder. The majority of the court concluded that the state could exercise its plenary discretion over the subsequent conduct of the prosecution pursuant to La.Code Crim.P. art. 61, and could retry the defendant for the offense of first degree murder and seek the death penalty. *Id*.

The 2009 Trial: Pre-Trial Proceedings

The defendant was once again indicted for the offense of first degree murder. The defendant moved to quash the indictment. The trial court granted the motion to the extent that it limited the indictment to a charge of second degree murder. The trial court reasoned that retrial for first degree murder would violate the defendant's constitutional protection against double jeopardy and penalize him for his success on

6

appeal by once again exposing him to a possible death penalty. The state sought review from this court. This court granted the state's writ and held that its earlier ruling regarding the issue of the trial being an absolute nullity was binding on the lower court and was the "law of the case." *State v. Langley*, an unpublished opinion bearing docket number 05-1475 (La.App. 3 Cir. 4/5/06), 925 So.2d 778. The defendant sought writs from the Louisiana Supreme Court. In a majority opinion, the supreme court reversed this court and held that the defendant could not be retried for first degree murder. *State v. Langley*, 06-1041 (La. 5/22/07), 958 So.2d 1160 (hereinafter *Langley III*). The state applied for a writ of review with the United States Supreme Court. That petition was denied on October 29, 2007. *See Louisiana v. Langley*, 552 U.S. 1007, 128 S.Ct. 493 (2007).

The 2009 Trial

Numerous pre-trial motions were filed by both the state and the defendant following the supreme court's decision. On June 24, 2008, the defendant waived his right to a trial by jury. The state moved to recuse the trial judge. Ultimately, Judge Wilford Carter was recused by order of this court, and Judge Robert Wyatt was randomly chosen to replace him. The state amended the bill to a charge of second degree murder, and the defendant entered a plea of not guilty and not guilty by reason of insanity on November 2, 2009. The court began hearing evidence that same day. In addition to the statements of the defendant and the physical evidence, both parties presented expert testimony relating to the defendant's insanity defense.

The defense presented testimony from a forensic psychiatrist, Dr. Rahn Bailey. He testified at length regarding the defendant's history, drawing from various sources including medical records, collateral sources such as information from family

7

members, a review of the defendant's actions and statements, and personal observations. He ultimately concluded that the defendant is schizophrenic, was psychotic and delusional at the time he killed Jeremy Guillory, and was unable to distinguish between right and wrong at the time he killed Jeremy Guillory.

The state also offered testimony from a forensic psychiatrist, Dr. Dennis Clayton Kelly, Jr. He also testified at length regarding the defendant's history after having reviewed statements, records and reports prepared by various health care professionals and the reports of evaluations conducted subsequent to this crime. He also viewed the statements given by the defendant and the evidence regarding his actions and behavior associated with this crime, as had Dr. Bailey. He disagreed with Dr. Bailey's ultimate diagnosis and conclusion, pointing to the defendant's linear thought process, his ability to remember details of the offense that were substantiated by physical evidence, and his actions regarding the hiding of evidence, such as the BB gun, after the offense was committed. He also noted the lack of evidence in any of the records or history which would indicate any significant period of time where the defendant had suffered severe, incapacitating symptoms. Dr. Kelly found no evidence of psychosis at the time the murder was committed, and he opined that the defendant did not lose the ability to distinguish between right and wrong due to mental illness.

The state also presented a transcript of the testimony of Dr. Aretta Rathmelle, who had testified in the 2003 trial of the defendant. Dr. Rathmelle, who passed away before the 2009 trial, concluded that the defendant could form specific intent to commit murder and knew right from wrong when he killed Jeremy.

8

The trial court found that, beyond a reasonable doubt, Ricky Langley killed Jeremy Guillory. It found that there was specific intent to kill. He specifically rejected Dr. Bailey's diagnosis of schizophrenia and accepted the opinion of Dr. Kelly. The trial court also made observations regarding the defendant's demeanor and conduct in recollecting the specifics of his acts. The trial court ultimately ruled that Ricky Langley was able to distinguish between right and wrong at the time of the offense. The trial court returned a verdict of guilty of the offense of second degree murder on November 6, 2009. The defendant filed motions for a new trial and arrest of judgment which were denied by the trial court.

It is from this conviction that the defendant appeals, assigning ten errors.

### ASSIGNMENTS OF ERROR

1. Retrial of Mr. Langley for the intentional killing of Jeremy Guillory violated Mr. Langley's state and federal constitutional rights to be free from Double Jeopardy.

2. Trial of this case after prescription had elapsed violated Mr. Langley's state statutory and constitutional speedy trial rights.

3. Trial of this case seventeen years after the initial indictment and five years after a retrial was ordered violated Mr. Langley's state and federal constitutional speedy trial rights.

4. Excluding defense evidence from a psychologist expert in confessions and interrogation violated Mr. Langley's state and federal constitutional rights to Due Process, to present a defense, to confront witnesses and to compulsory process as well as his state statutory right to challenge the reliability of his confession at trial.

5. Barring the defense from eliciting evidence regarding the interrogating detective that was relevant to the weight and reliability to be attached to Mr. Langley's confessions violated Mr. Langley's state and federal constitutional rights to Due Process, to present a defense, to confront witnesses and to compulsory process as well as his state statutory right to challenge the reliability of his confession at trial.

6. Admitting evidence of the previously excluded Georgia Doc records violated Mr. Langley's state and federal constitutional rights to Due Process as well as La. C. E. art. 404.

9

7.  Forcing Mr. Langley to choose between his right to plead not guilty by reason of insanity and his right to insist upon the protections of the Code of Evidence violated Mr. Langley's state and federal constitutional rights to Due Process.

8.  Admitting into evidence the fruits of Mr. Langley's unlawful arrest violated Mr. Langley's state and federal constitutional rights to Due Process, to be free from an unreasonable search and seizure as well as his statutory right to the suppression of illegally obtained evidence.

9.  Admitting into evidence the March 26, 1992 statement violated Mr. Langley's state and federal constitutional rights to Due Process, to the assistance of counsel and to be free from unreasonable search and seizure.

10. The recusal of Judge Carter violated Mr. Langley's state and federal constitutional rights to Due Process as well as his statutory right to proceed before the allotted judge in the absence of grounds for recusal.

## ERRORS PATENT

In accordance with La. Code Crim. P. Art 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent concerning the advice given regarding the time limitation for filing an application for post-conviction relief. After the court imposed the defendant's sentence, the prosecutor pointed out that the "defendant needs to be made aware of the two years post-conviction relief part of the sentencing." Immediately thereafter, the judge stated, "I'm sorry, you're very correct. Mr. Langley, Ms. Van Cleave, the law provides you have two years to appeal from the time of the rendition of judgment and conviction. You have that right. You're so notified of that right at this time."

According to La. Code Crim. P. art. 930.8, the two year prescriptive period for filing an application for post-conviction relief begins to run when a defendant's conviction and sentence become final under the provisions of La.Code Crim. P. art. 914 or 922. The trial court is directed to inform the defendant of the correct

10

prescriptive period by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

## ASSIGNMENT OF ERROR NUMBER ONE: DOUBLE JEOPARDY

In his first assignment of error, the defendant alleges that his retrial for the intentional killing of Jeremy Guillory violated his state and federal constitutional rights to be free from double jeopardy. He argues that the prosecution for second degree murder was barred by principles of double jeopardy and collateral estoppel. Specifically, he contends that the issue of whether or not he had specific intent to kill was litigated in his favor in the previous trial. The defendant argues that in the previous trial, he conceded that he killed Jeremy Guillory and that Jeremy was less than twelve years old. With these two elements of the offense conceded, he argues that the jury's verdict of second degree murder necessarily rejected the specific intent theory of the crime. He argues that he could not therefore, be re-prosecuted under a specific intent theory.

Although the defendant argues that he could not be re-tried under double jeopardy principles, the supreme court, after conducting a double jeopardy analysis, determined that he could be re-tried for second degree murder. While it is true the supreme court did not discuss the issue regarding intent, re-prosecutions such as the present one are allowed because second trials do not offend double jeopardy principles when they occur pursuant to judicial error. *State v. Mayeaux*, 498 So.2d 701 (La.1986).

Regarding the collateral estoppel argument, we note the following jurisprudence:

11

The Fifth Amendment's Double Jeopardy Clause protects against successive prosecutions following acquittal or conviction, as well as multiple punishments for the same offense. *See also*, LSA-Const. art. I, § 15; La.C.Cr.P. art. 591 *et seq.* The collateral estoppel component of the Double Jeopardy Clause prohibits the state from relitigating an issue of ultimate fact that has been determined by a valid and final judgment. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *State v. Cotton*, 00-0850, pp. 5-6 (La.1/29/01), 778 So.2d 569, 574, *reh'g granted in part, on other grounds*, 00-0850 (La.4/20/01), 787 So.2d 278. A fact is considered "ultimate" if it is necessary to a determination of the defendant's criminal liability. *State v. Miller*, 571 So.2d 603, 607 (La.1990).

Collateral estoppel bars relitigation of only those facts necessarily determined in the first trial. *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir.1997), *cert. denied*, 522 U.S. 934, 118 S.Ct. 341, 139 L.Ed.2d 265 (1997). Where a fact is not necessarily determined in a previous trial, the state is not barred from reexamining the issue. *Id.* Accordingly, the first step in resolving a collateral estoppel claim is to discern which facts were "necessarily determined" in the first trial. *Id.*

The courts have placed the burden "on the defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Dowling v. United States*, 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708 (1990). The application of this test to criminal cases is complicated by the fact that an acquittal by general verdict does not specify the facts "necessarily decided" by the jury. Therefore, to determine which facts were "necessarily decided" by the general acquittal in the first trial, it is necessary to examine the record of the prior proceeding in order to determine " 'whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " *Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194 (citations omitted).

*State v. Ingram*, 03-1246, pp. 3-4 (La.App. 5 Cir. 10/28/04), 885 So.2d 714, 716-17, *writ denied*, 04-3135 (La. 4/1/05), 897 So.2d 600.

When a lesser included offense to the crime charged is returned by a jury it is not always possible to determine why that verdict was reached. It is possible that the jury convicted the defendant of specific intent second degree murder. It is possible that the jury verdict was based on a jury finding under the felony-murder rule, and the jury determined there was no specific intent to kill. It is equally plausible that, given

12

the nature of the case, the verdict was, in fact, a compromise verdict. Regardless of the jury's thought process in this particular case, clearly the argument that the issue of specific intent was "necessarily determined" is unsupported. The defendant has not carried his burden of proving that the element of specific intent was actually decided in the previous trial. This assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER TWO: PRESCRIPTION

In this assignment of error the defendant argues the case against him has prescribed, as his retrial was not timely commenced. Louisiana Code of Criminal Procedure Article 582 provides:

> When a defendant obtains a new trial or there is a mistrial, the state must commence the second trial within one year from the date the new trial is granted, or the mistrial is ordered, or within the period established by Article 578, whichever is longer.

The defendant argues that the judgment of this court reversing his earlier conviction became final on January 12, 2005. *Langley II*, 896 So.2d 200; La.Code Crim.P. art. 922. He concedes that certain events after January 12, 2005, suspended the prescriptive period. He argues that June 5, 2008 was the latest day that trial could legally commence.

We agree that the judgment reversing his conviction became final on January 12, 2005. On February 10, 2005, the defendant filed a Motion To Recuse the District Attorney. The court minutes reflect that a hearing was held on March 31, 2005, at which time the defendant's Motion To Recuse the District Attorney was set for hearing on May 11, 2005.

There is no evidence in the record of a May 11, 2005 hearing, but the minutes reflect that on May 12, 2005, the trial judge, in open court, refixed the Motion To Recuse for June 16, 2005. One week prior to this date, on June 9, 2005, the defendant

13

filed a Motion For Court to Honor Its Earlier Order Continuing The Hearing on Defense Motion to Recuse District Attorney. The record does not reflect any court proceedings on June 16, 2005. Subsequently, however, on August 23, 2005, a letter from defense attorney Phyllis Mann to the presiding judge was filed in the record. In that letter, defense counsel requested that the Motion to Recuse be set for hearing on the motion hearing dates set aside on October 5, 6, 14, and 18, 2005.

The minutes reflect that the next hearings were held October 31, 2005, at which time the Motion to Recuse the District Attorney was taken up. The minutes further reflect that defense counsel presented to the court three distinct reasons to recuse the district attorney's office: 1) the issue of conflict of interest regarding funding issues, 2) the issue regarding Assistant District Attorney Richard Oustalet's representation of a key witness in a personal matter, and 3) the issue of former District Attorney Rick Bryant's personal feelings toward the defendant. According to the minutes, the trial court denied the motion as to both the funding issue and the issue involving the former district attorney's personal feelings toward the defendant, but the court declined to rule on the last issue, granting the defendant additional time to investigate the matter and funding to conduct the investigation. The minutes specifically state, "The Court further orders that the defendant's prescription time will not begin until the Court has made a final ruling on the Motion to Recuse as a whole." A review of the transcript of the October 31, 2005, hearing, however, reflects that the court actually did not rule on any aspect of the motion.

THE COURT:

We left the conflict on the lawyer representing the witness; okay? We're going to give you more time to develop that a little more; okay? Once you're ready after thirty days, I will expect you to let me know if you want to have another hearing on that.

14

MS. MANN:

Thank you, Your Honor.

THE COURT:

And I would think that you have more than you have now, because you don't have enough for me to make a ruling on it today. So, for right now, the D.A. is still in the case. I denied all grounds except leaving open the one conflict possibility because the Assistant District Attorney represents the key witness.

MS. MANN:

And obviously, Your Honor, we would object to the Court's ruling, but given that you allowed us thirty days to develop and funds with which to do that, thank you. To develop that evidence, just so that we don't get on any writ confusion grounds, here, okay? We consider this all to be one motion ----

THE COURT:

Yes, that's right. So, your time won't begin to run yet, until after the thirty days hearing. That's right. So everything will be consolidated into one ruling so that you can take writs on everything to include what I've done today. *I guess what I'm doing, is I'm telling you what I'm going to do on the other two areas of your motion , and I'm leaving one open. At which time I will make a ruling on all of them together.* But I'm telling you what the ruling will be on two of them, and one of them you have the opportunity to present more evidence.

(Emphasis added.)

Following this hearing there was a significant amount of activity reflected in the record by the defense regarding this motion as they issued numerous subpoenas *duces tecum* for various records held by individuals and organizations. On November 29, 2005, the defendant filed a Motion To Set Hearing Date For Motion to Recuse District Attorney, stating the investigation was complete. A review of the transcript of a hearing held January 4, 2006, reflects that the defense was actively preparing to present further evidence on this matter to the court. It is clear that at that time the motion was still pending. The motion was set for hearing on February 22, 2006.

15

There is no evidence in the record, however, that the February 22, 2006 hearing was ever held. There are no further motions by the defendant to re-fix the motion for hearing. A careful review of the record leads this court to the conclusion that no hearing was held, and the trial court never issued a ruling on this motion. Further, there is no indication in the record that this matter was withdrawn.

Louisiana Code of Criminal Procedure Article 580 provides:

> When a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended *until the ruling of the court thereon*; but in no case shall the state have less than one year after the ruling to commence the trial.

(Emphasis added.)

At a hearing on the defendant's Motion to Quash the Indictment due to prescription on September 17, 2009, the defendant asserted that the third issue pertaining to the Motion to Recuse the District Attorney was resolved at a hearing held March 22, 2006. He argued that because he did not file any objections after that hearing for the failure of any person to produce subpoenaed records thought to include *Brady* material, he waived the right to pursue the Motion to Recuse. Defense counsel stated to the trial court at the September hearing:

> And the Court, in fact, said on March 22, if you've got any objection or anything to say about this, then you have until April 7th, 2006 to pursue this matter. The defense did not have any objection. The matter was resolved.

This argument is not consistent with the record of the March 22 hearing. The March 22 hearing was convened to discuss discovery requests related to the assistant district attorney's representation of Detective Delouche in a civil case. The trial court heard arguments about the discovery issues, and by the end of the hearing the parties had agreed on the parameters of the subpoenas. The trial court scheduled a hearing for

16

April 7 to hear arguments concerning the *discovery issues*, not about the Motion to Recuse. When the parties waived the April 7 hearing, it meant that the discovery issues were resolved, not that the Motion to Recuse the District Attorney was waived. The trial court never made a final ruling on the Motion to Recuse District Attorney, as required by La.Code Crim.P. art. 580, which the trial court specifically stated at the October 31, 2005 hearing was required for prescription to begin running again.

The filing by the defendant of the Motion To Recuse the District Attorney was a preliminary plea which suspended the running of the one-year limitation set forth in La.Code Crim.P. art. 578. *State v. Vincent*, 02-1452 (La.App. 3 Cir. 4/2/03), 843 So.2d 1174; *State v. McDonald*, 02-909 (La.App. 3 Cir. 2/5/03), 838 So.2d 128, *writ denied*, 03-807 (La. 10/17/03), 855 So.2d 758. The trial court never ruled on that motion, and it was never withdrawn by the defendant. Therefore, the time limitation was suspended until the trial began on November 2, 2009, when both the state and the defense announced that they were ready for trial, and the trial commenced. The defendant did not object to or raise the issue of the pending Motion to Recuse District Attorney. The motion was pending until the day the trial began, at which time it was considered abandoned by the defendant. *State v. Craig*, 32,209 (La.App. 2 Cir. 8/18/99), 747 So. 2d 604. His failure to object constitutes a waiver of the objection. *State v. Woodfox*, 291 So.2d 388 (La.1974); *State v. Jennings,* 07-150 (La.App. 3 Cir. 5/30/07), 958 So.2d 144, *writ denied*, 07-1460 (La. 1/7/08), 973 So.2d 731; *State v. Pratt*, 32,302 (La.App. 3 Cir. 9/22/99), 748 So.2d 25.

The filing of the Motion To Recuse District Attorney suspended the running of the prescription. It remained suspended as it was neither withdrawn by the defendant nor ruled upon by the court before the trial commenced. Even if defense

17

counsel's arguments at the September 17, 2009 hearing amount to a waiver or withdrawal of the Motion to Recuse the District Attorney, the suspension of prescription from February 2005 until September 2009 makes the November 2009 trial date timely. There is no violation of the defendant's right to a speedy trial.

This assignment of error has no merit.

## ASSIGNMENT OF ERROR NUMBER THREE: RIGHT TO A SPEEDY TRIAL

In his third assignment of error, the defendant alleges that trial of this case seventeen years after the initial indictment and five years after a retrial was ordered violated his state and federal constitutional speedy trial rights. The trial court denied his motion below in light of its ruling on prescription. Statutory prescription and constitutional speedy trial rights are, in fact, interrelated:

> While it is elementary that legislative acts may not impair constitutional guarantees, . . . . [A]n enactment is a recognition by the legislature that the time limitation thereby ordained is reasonable and acceptable under ordinary circumstances. Statutes of limitation are the primary guarantees against inordinate delays between accusation and trial. La.Code Crim.Pro. arts. 578--52; 18 U.S.C.A. s 3281--82; *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); *State v. Howard*, 325 So.2d 812 (La.1976); *State v. Stetson*, 317 So.2d 172 (La.1975); *State v. Gladden*, 260 La. 735, 257 So.2d 388 (1972). There [sic] statutes represent a legislative assessment of relative interests of the State and defendant in administering and receiving justice, and they should be considered by the courts. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *State v. Theard*, 203 La. 1026, 14 So.2d 824 (1943). Judged by this legislative criterion, the delay in the instant case is neither inordinate nor unreasonable.

*State v. Alfred*, 337 So.2d 1049, 1055-56 (La.1976).

The test for constitutional speedy trial claims is well-settled:

> The constitutional right to a speedy trial is imposed upon the states by the Due Process Clause of the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 223, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967). The underlying purpose of this constitutional right is to protect a

18

defendant's interest in preventing pretrial incarceration, limiting possible impairment of his defense, and minimizing his anxiety and concern. *Barker v. Wingo*, 407 U.S. 514, 515, 92 S.Ct. 2182, 2184, 33 L.Ed.2d 101 (1972). The Supreme Court has set forth the following four factors for courts to consider in determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of his right to speedy trial; and (4) the prejudice to the accused resulting from the delay. *Id.* at 531-532, 92 S.Ct. at 2192-93; *see also State v. Reaves*, 376 So.2d 136 (La.1979) (adopting *Barker* factors). The specific circumstances of a case will determine the weight to be ascribed to the length of and reason for the delay because "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Reaves*, 376 So.2d at 138 (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192).

*State v. Batiste*, 05-1571, pp. 6-7 (La.10/17/06), 939 So.2d 1245, 1250.

The defendant is correct in asserting that the seventeen-year time span between the original action against him and the most recent trial is presumptively prejudicial. Therefore, we will analyze this matter under the factors mandated by *Barker*.

The first factor deals with the length of the delay. As previously noted, the most recent trial occurred approximately seventeen years after institution of the initial prosecution.

The second factor addresses the reasons for the delay. The defendant acknowledges that over the years there were valid delays, but he argues the major delays were not attributable to him. The procedural history of this case is set forth above. It is necessary, in determining whether the length of the delay results in a violation of the defendant's constitutional right to a speedy trial, to examine the peculiar circumstances in this case.

The defendant was convicted of first degree murder in 1994, and he received the death penalty for the homicide which occurred in 1992. The appellate process ran its normal course. Ultimately, that conviction was overturned by the Louisiana

Supreme Court because of a constitutional defect, racial discrimination in the grand jury foreman selection process, in 2002. *Langley I*, 711 So.2d 651; *Langley*, 813 So.2d 356.

The defendant was retried for first degree murder and ultimately convicted of the lesser included offense of second degree murder. That conviction was reversed by this court in December 2004 due to structural errors in the procedure related to the trial judge's improper absences from the courtroom during the proceedings. This court declared that proceeding to be a nullity. *Langley II*, 896 So.2d 200.

The defendant was re-indicted for the offense of first degree murder. The defendant filed a motion to quash the indictment since the previous trial had resulted in a conviction of a lesser included offense. The trial court agreed, and it limited the indictment to a charge of second degree murder. After appeal by the state, the trial court was reversed by this court. The defendant took a writ application to the Louisiana Supreme Court, which ultimately ruled in his favor, ordering the trial court's ruling reinstated. *Langley III*, 958 So.2d 1160. The issue was not resolved by the Louisiana Supreme Court until May 22, 2007. In the interim, there were numerous pretrial motions filed by the defendant in preparation for trial, and numerous hearings associated with those motions as well as proceedings associated with the defendant's numerous requests for subpoenas *duces tecum*. One of the motions filed was the Motion to Recuse District Attorney, more fully discussed above, which was vigorously pursued but never resolved since the defendant made no request to set it for final hearing.

Subsequent to the ruling of the Louisiana Supreme Court, the state exercised its right to pursue a writ of review to the United States Supreme Court. The Supreme

Court denied certiorari on October 29, 2007. Although the defense argues the delay involved regarding this application for writ of review should have no bearing in this matter, the delay involved was beyond the control of the state, which was exercising its right to pursue a remedy provided to it by law.

A few months later, new defense counsel filed a Motion to Enroll, which was followed almost immediately by a written objection filed by the defendant as to her representation of him in this matter. Although the defense argues there was never any question as to who was representing the defendant, the trial court correctly noted, and a review of the record reflects, that there was. The record shows that the two attorneys who had been consistently making appearances and filings for the defendant stopped appearing, although there was no motion filed by either of them to withdraw.

Two months after new counsel filed a Motion to Enroll, the defendant waived his right to a trial by jury. This waiver was followed by a motion filed on behalf of the state to recuse the trial judge because of his personal bias toward key state witnesses. The motion was denied on its face by the trial court. This court reversed that ruling and remanded it for a hearing on the merits in front of a different judge. The motion was again denied. The state filed a writ application to this court, which reversed the trial court's ruling and ordered the trial judge recused in January 2009. The defendant filed a writ application to the Louisiana Supreme Court. That application was initially rejected as untimely, but, on reconsideration, was denied on May 19, 2009.

In the interim, a new judge was alloted to this case, and on February 11, 2009, the trial court ordered the matter fixed for trial on June 1, 2009. On June 1, 2009, the trial court ordered motions to be heard on August 4, 2009, because of the pending

21

motion to quash based on prescription. On August 3, 2009, the court reset the motion hearing date for September 17, 2009, when it was ultimately heard.

The trial court took the matter under advisement and set the trial date for November 2, 2009. On October 28, 2009, the court issued a denial of the motion to quash. Trial began on November 2, 2009.

There have been a significant number of delays in this matter. We have reviewed the history of the case and the seriousness of the offense charged, which involves the murder of a young child. We are mindful that this prosecution began as a capital case, and in its present posture carries a mandatory life sentence. The defendant has been afforded three trials because of judicial error recognized by the supreme court and this court. We find that the delays occurred while serious legal issues were under review, and we do not find these delays to be unjustified.

The third factor in *Barker* involves the accused's assertion of his right to a speedy trial. We note the defendant filed a motion to quash on August 5, 2008, based on prescription, just four days after the state filed a motion to recuse the trial judge. He filed a separate motion for speedy trial on August 4, 2009.

The fourth factor in *Barker* addresses the prejudice to the accused resulting from the delay. As to this factor, the state asserts that, "'Anxiety and concern' are not sufficient to let a confessed murderer walk free." In this context, we note the supreme court has stated:

> There is, of course, some prejudice inherent in all accusations of crime, arrests and incarcerations. The anxiety and concern suffered by the accused and the disruption of his family life by the charge and incarceration are factors to be considered. Loss of his job is another. But defendant has not alleged disruption of his family life, and the record does not shed light on whether he had a job. Deprivation of liberty which results from incarceration is always prejudicial. But this prejudice, like other, is a necessary consequence of any valid criminal

22

charge, especially where the accusation involves first degree murder, a non-bailable offense.

> The amorphous quality of the right to a speedy trial leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because, unlike the exclusionary rule or the reversal for a new trial, it means that a defendant who may be guilty of a serious crime, or two as in this case, will go free without having been tried. Overzealous application of this remedy would infringe 'the societal interest in trying people accused of crime, rather than granting them immunization because of legal error. . . .' *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), White, J. Barring extraordinary circumstances, courts should be reluctant indeed to rule that a defendant has been denied a speedy trial."

*Alfred*, 337 So.2d at 1057. The *Alfred* court recognized that evidence that a defense had actually been impaired would weigh in favor of finding that a defendant's speedy trial rights had been violated. However, our reading of the record indicates the defendant was able to put forth a vigorous defense. The difficulties and errors he alleges on the other assignments of error in this matter are not based upon allegations that witnesses were missing or dead. In his brief, he alleges that two witnesses were dead and another was too ill to travel from out of state for trial. He made similar contentions in his written motion below. He does not allege what evidence was lost to his case by the absence of these witnesses. Further, in regard to two of those witnesses, Ruth McClary and psychiatrist Aretta Rathmell, we note that transcripts of their testimonies in the prior proceedings were admitted into evidence.

Balancing all of the *Barker* factors, we find this assignment of error lacks merit. The total delay was long, but the great majority of it was due to the legitimate (albeit unique) course of this case. The defendant asserted the right to a speedy trial relatively late in the proceedings. He has not shown specific prejudice to his case.

### ASSIGNMENTS OF ERROR NUMBERS FOUR AND FIVE: RELIABILITY OF LANGLEY'S CONFESSIONS

In his fourth and fifth assignments of error, the defendant argues the trial court erred by preventing him from introducing testimony to support his argument that he falsely confessed to molesting the victim. The defendant acknowledges that in his third videotaped statement to Detective Delouche, he said he ejaculated in the victim's mouth. However, he claims this was a false assertion prompted in part by Detective Delouche's interrogation techniques and Detective Delouche's own background. For support, he refers to evidence filed under seal in the trial court.

The defendant also notes in support of his arguments below, that he sought to introduce the testimony of forensic psychologist Dr. Sol Fulero. The defendant argues the court should have heard Fulero's testimony, because it met the "*Daubert* criteria."

The supreme court has addressed *Daubert* in *State v. Manning*, 03-1982, p. 44 (La. 10/19/04), 885 So.2d 1044, 1086-87, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745 (2005):

> This Court has adopted the reasoning and observations set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which specifically rejected the "general acceptance" test and outlined the means for determining the reliability and answered many questions as to proper standards for the admissibility of expert scientific testimony. *State v. Foret*, 628 So.2d 1116, 1122 (La.1993). In *Daubert*, the Supreme Court stated that an inference or assertion of scientific knowledge must be derived by the scientific method. Proposed testimony must be supported by appropriate validation, i.e., "good grounds," based on what is known. *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. In short, evidentiary reliability will be based on scientific validity. *Id.*, 509 U.S. at 590, 113 S.Ct. 2786, n9. The trial court must determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. The trial court must make "a ... preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue. Many factors will bear on the inquiry...." *Id.*, 509 U.S. at 592-93, 113

S.Ct. 2786 "General acceptance" can have a bearing on the issue. *Id.*, 509 U.S. at 594, 113 S.Ct. 2786.

However, the reliability of Dr. Fulero's methodology was not the focus of the trial judge's ruling. Rather, the judge indicated that he did not think the testimony would assist him in reaching a decision regarding whether the defendant gave a false confession. Such decisions are reviewed under the "abuse of discretion" standard. *See, e.g., State v. Young*, 09-1177 (La. 4/5/10), 35 So.3d 1042, *cert. denied*, __ U.S. __, 131 S.Ct. 597 (2010).

Having read the sealed materials, we find the trial court did not abuse its discretion. The material regarding Detective Delouche does not remotely suggest that anything in his background would have caused him to guide or influence the defendant to falsely confess to molesting the victim. Further, it is not clear how the lack of such evidence prejudiced the defendant's case. As noted in the first assignment of error, the state prosecuted him for specific intent second degree murder, and he has repeatedly admitted that he killed Jeremy Guillory. The defendant has sought to show he was insane, or at least to negate specific intent. The question of whether he performed a sex act would appear to be superfluous. It was not an element of the crime, there was no jury to be inflamed by the allegation, and its bearing on issues of sanity and intent are not explained by the defendant.

In finding the defendant guilty, the trial judge noted that expert testimony indicated that it was unlikely a person in a psychotic state could have a sexual experience. This indicates how a sex act could have a bearing on the ultimate issue in the case. However, the trial judge indicated he did not believe the defendant ejaculated into the victim's mouth. Rather, the judge suggested the defendant may have ejaculated while strangling the boy from behind. Apparently, no semen was

found in the victim's mouth, but some semen was found on a side seam of the boy's shirt, as the defendant acknowledges. Thus, the record indicates the trial judge rejected the specifics of the defendant's March 1992 confession to Detective Delouche. For the reasons discussed, we find the trial court did not abuse its discretion by electing not to hear Dr. Fulero's testimony. Even if the defendant sought more generalized testimony from Dr. Fulero regarding the allegedly false confession to the sex act, it is not clear how it would have been relevant, independent of the material regarding Detective Delouche. Therefore, this portion of the defendant's argument lacks merit. The arguments related to *Daubert* and to funding issues that appear in the parties' briefs need not be addressed, as our analysis renders them moot.

The defendant also argues the trial court erred by limiting his cross-examination of Detective Delouche. He was not allowed to delve into the matters that were introduced under seal. For the reasons already discussed, we find the court did not abuse its discretion by limiting the defendant's questioning of Detective Delouche. The information simply was not relevant to the current case. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER SIX: ADMISSION OF GEORGIA RECORDS

The defendant divides this argument into two parts. First, the defendant argues the trial court erred by allowing the state to refer to his criminal records from Georgia and his "dream diary" in violation of the "law of the case doctrine." This court has discussed "law of the case":

> "Under the doctrine of 'law of the case,' an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. *State v. Doussan*, 05-586 (La.App. 5 Cir.

26

2/14/06), 924 So.2d 333, 339, *writ denied*, 06-608 (La. 10/13/06), 939 So.2d 372." *State v. Bozeman*, 06-679, p. 6 (La.App. 5 Cir. 1/30/07), 951 So.2d 1171, 1174.

*State v. Quinn*, 09-1382, pp. 2-3 (La.App. 3 Cir. 5/12/10), 38 So.3d 1102, 1104.

A review of the jurisprudence has found no case in which the doctrine has been applied to a trial judge's rulings on issues that were ruled upon by an earlier trial judge in a prior trial of the same case. The defendant cites two civil cases from the supreme court, *Pumphrey v. City of New Orleans*, 05-979 (La. 4/4/06), 925 So.2d 1202 and *Carriere v. Bank of Louisiana*, 95-3058, p. 9 (La. 12/13/96), 702 So.2d 648, 655, for the principle that the law of the case doctrine includes "the binding force of trial court rulings during later stages of the trial."

The principle pronounced is inapplicable to the present case, as the trial at issue is not a "later stage" of the prior trials. Also, the doctrine manifests the appellate court's general practice of not relitigating decided matters. It is not a limit on judicial authority. *Pumphrey*, 925 So.2d at 1207-08. We note the supreme court's ruling in *State v. Graham*, 375 So.2d 374 (La.1979):

> Defendant, Burlon Graham, was charged with driving while intoxicated as a second offender, La.R.S. 14:98. He was subsequently tried, convicted and sentenced to serve a period of sixty days in the parish prison and pay a fine of $350.00, in default of which he would be required to serve an additional one hundred and twenty days. Upon application by defendant, we granted writs, reversed the conviction and sentence, and remanded the case for a new trial on the grounds that the trial court erred in permitting the state to establish a presumption of defendant's intoxication through the introduction of a chemical analysis of his blood's alcoholic content without presenting prima facie proof of the standard quality of the test chemicals. *State v. Graham*, 360 So.2d 853 (La.1978).

> On May 1, 1979, defendant was again brought to trial for the same offense. During the trial, the prosecuting attorney attempted to question state witness Officer Russell Robinson concerning defendant's responses to questions outlined on an alcohol influence report form. Defense counsel interrupted this examination, objecting to the questions

27

on the grounds that evidence as to whether an alcohol influence report form was used, and defendant's responses to any questioning from such a form, had not been introduced at the previous trial and that the state should not be permitted to now introduce new and different evidence. After the objection was sustained by the trial court, the state assigned error. The trial was then recessed to permit the state to apply to this Court for supervisory writs.

In its application to this Court, the state correctly argues that the trial court erred in ruling that at the new trial the state was limited to evidence introduced at the previous trial. Article 857 of the Code of Criminal Procedure states that "(t)he effect of granting a new trial is to set aside the verdict or judgment and to permit retrial of the case with as little prejudice to either party as if it had never been tried." Official Revision Comment (a) clarifies the intent of the provision by noting that "(t)his article continues the sound rule of Art. 515 of the 1928 Code of Criminal Procedure, that the state is wiped clean when a new trial is granted." Thus in the absence of an independent constitutional or statutory ground requiring exclusion, the state may properly introduce evidence at a new trial which was not placed into evidence at the previous trial. Cf. *State v. Reed*, 324 So.2d 373 (La.1975).

*State v. Graham*, 375 So.2d at 374 (La.1979).

Thus, the trial at issue was a new proceeding and not a subsequent stage of the earlier ones. Therefore, the "law of the case" doctrine does not apply. This portion of the assignment lacks merit.

Further, the matter before us for review was a bench trial. As the defendant notes in the second part of his argument, the jurisprudence recognizes that bench trials are different than jury trials because judges are presumed to have the ability "to respect the rules of evidence and the constitutional rights of the defendant."

The fifth circuit has explained:

The admissibility of evidence in a bench trial is different from the requirements in jury trials, because a judge by virtue of training and knowledge of the law is capable of disregarding any impropriety. *State v. Anderson*, 02-273 (La.App. 5 Cir. 7/30/02), 824 So.2d 517, 521, *writ denied*, 02-2519 (La. 6/27/03), 847 So.2d 1254.

*State v. Hebert*, 05-1004, p. 13 (La.App. 5 Cir. 4/25/06), 930 So.2d 1039, 1048.

28

Similarly, the supreme court has stated, "Because the proceeding was a bench trial, the possibility for prejudicial effect on the trial judge was far less than upon a jury." *State v. Walker*, 394 So.2d 1181, 1185 (La.1981).

In his brief, the defendant raises concerns regarding the following statement by the trial judge:

THE COURT:

> Let me assure everyone if I'm going to be put in a position someone's going to be asking me to find this young man not guilty by reason of insanity, let me assure you, I want to know everything there is to know.
>
> And I don't care what Judge said what about records not being available to any specialist. Until somebody shows me why I shouldn't be exposed to those records then somebody's got some -- like Desi says, somebody's got some 'splain' to do.

The court made earlier comments regarding the relevance of the Georgia records:

THE COURT:

> Hold on, Mr. Bryant. Let me make sure I understand.
>
> I have not heard Mr. Bryant or Ms. Killingsworth contend that they want anyone to discuss or render any opinions regarding these Georgia DOC records.
>
> So I'm kinda at a loss. What I heard them say was that nobody is going to rely on those. They're concerned that Dr. Bailey may have some reliance on them, but Mr. Bryant has already indicated that he would bring that out or discuss that in cross examination.
>
> I'm missing something here?

More specifically, one of the prosecutors made the following statements:

MR. BRYANT:

I don't know what she's talking about, Your Honor.

In the first trial they were opened up because their expert relied on the records and had read them. In this trial he's relying on the records.

I think the State is perfectly in its right to question about anything that's in those Georgia records that we think is relevant to Ricky Langley.

Obviously, there may be things that are irrelevant. It was allowed in the first trial. He just indicated that she's shown him the Georgia records. I don't think you can pick and choose which Georgia records we're gonna talk about. Either he reviewed them or he didn't review them.

If he didn't review then we won't ask any questions. If he did review them then we're entitled to ask any questions about it. And he just indicated he did.

. . . .

MR. BRYANT:

Again, Your Honor, if he reviewed medical records which concerned -- they are medical records, mental health records from the state of Georgia as part of his opinion that he's rendering then we're allowed to ask any questions from those medical records.

I mean, I don't know that Judge Gray ruled, but it's basically Hornbook Law, Your Honor. If he didn't review those records and didn't use those as the basis to form his opinion, perhaps we wouldn't be able to do so, but I still think that --

The material at issue was relevant to the case, and defense counsel's comments during argument indicate any references to the Georgia records were not unduly prejudicial. We note the following statement made by defense counsel: "We're not scared of the Georgia records. Georgia records support our position. But they were ruled out in 2003." Shortly after these comments, the court recessed. When proceedings resumed, the defense continued its direct examination of one of its

30

experts, forensic psychiatrist Dr. Rahn Bailey. No further objection was made regarding the admissibility of the Georgia records.

Regarding references to the "dream diary," the defendant did not specifically object to its admissibility. Instead, he referred generally to "material that was ruled out [in] 2003." Also, the defendant based his argument on the "law of the case" doctrine, rather than relevancy or prejudice. We find the defendant's present argument regarding prejudice was not preserved, pursuant to the "contemporaneous objection rule" codified in La.Code Crim.P. art. 841, and it was not precluded based on "law of the case," as has been discussed above.

The state made an apparent reference to the diary in its rebuttal argument at the close of the trial. However, as the state explained in response to the defendant's objection, it was responding to the defendant's closing argument, which emphasized the lack of an explanation for his conduct. The defendant's closing argument was focused on the issue of specific intent and on his own alleged insanity and specifically claimed the state's "theory of molestation makes no sense." The state's remarks in rebuttal argument formed a fair comment on a matter to which the defendant had "opened the door." The supreme court has held:

> Louisiana jurisprudence on prosecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics. In addition, La. C.Cr.P. art. 774 confines the scope of argument to "evidence admitted, to the lack of evidence, to conclusion of fact that the state or defendant may draw therefrom, and to the law applicable to the case." The trial judge has broad discretion in controlling the scope of closing argument. *State v. Prestridge*, 399 So.2d 564, 580 (La.1981). Even if the prosecutor exceeds these bounds, the Court will not reverse a conviction if not "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. *See State v. Martin*, 93-0285 (La. 10/17/95), 645 So.2d 190, 200; *State v. Jarman*, 445 So.2d 1184, 1188 (La.1984); *State v. Dupre*, 408 So.2d 1229, 1234 (1982).

*State v. Legrand*, 02-1462, p. 16 (La. 12/3/03), 864 So.2d 89, 101, *cert. denied*, 544 U.S. 947, 125 S.Ct. 1692 (2005). This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER EIGHT: LAWFULNESS OF THE ARREST

The defendant asserts the trial court erred "in refusing to suppress the fruits for the warrantless arrest of Mr. Langley and the Improperly Induced Confession of March 26, 1992."

Unlawful Arrest

On November 2, 2009, the defendant filed in the trial court a "Renewed Motion to Suppress Statements and Evidence as Products of Unlawful Arrest and Seizure." A hearing on the motion was held on that same date, and the trial court denied it in open court.

*A. Timeliness of Motion*

The state, in its response brief filed in the trial court, argued the defendant's motion was untimely urged. The state wrote, "There is absolutely no reason why the defendant, who has been filing motions for many months now even past that set deadline, had to wait to the day of trial to spring this suppression motion on this Court and the State." In support of its claim, the State cited *State v. Davis*, 05-543 (La.App. 3 Cir. 12/30/05), 918 So.2d 1186, *writ denied*, 06-587 (La. 10/13/06), 939 So.2d 372, in which this court upheld the trial court's denial of a defendant's motion to suppress as untimely under La.Code Crim.P. arts. 703(C) and 521.

Louisiana Code of Criminal Procedure Article 703 provides, in pertinent part:

A. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.

B. A defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant.

C. A motion filed under the provisions of this Article must be filed in accordance with Article 521, unless opportunity therefor did not exist or neither the defendant nor his counsel was aware of the existence of the evidence or the ground of the motion, or unless the failure to file the motion was otherwise excusable. The court in its discretion may permit the filing of a motion to suppress at any time before or during the trial.

Louisiana Code of Criminal Procedure Article 521 provides:

Pretrial motions shall be made or filed within fifteen days after arraignment, unless a different time is provided by law or fixed by the court at arraignment upon a showing of good cause why fifteen days is inadequate.

Upon written motion at any time and a showing of good cause, the court shall allow additional time to file pretrial motions.

Following the quashing of the first indictment, the defendant was re-indicted for first degree murder on April 11, 2002. A second trial was held, and Langley was convicted of second degree murder. On appeal, this court reversed the conviction. *Langley II*, 896 So.2d 200. The pretrial process began again. On August 25, 2005, the defendant filed a motion to quash the indictment on the basis of double jeopardy. Specifically, the defendant was acquitted of first degree murder when the jury found him guilty of second degree murder. On October 31, 2005, a hearing was held, and the trial court granted the motion in that it limited the charge to second degree murder. The state sought writs in this court, and this court reversed the trial court's ruling. The defendant sought review by the supreme court, and the supreme court reversed this court's decision, reinstating the trial court's ruling. *Langley III*, 958 So.2d 1160.

On November 2, 2009, at the beginning of the third trial, the defendant re-urged his motion to suppress, and the trial court denied the motion. On that same day,

the state "amended" the bill to second degree murder, and the defendant entered a plea of not guilty/not guilty by reason of insanity. Consequently, we find that at the time the motion to suppress was re-urged, the time period under Article 521 had not been triggered, and the motion was timely submitted.

*B. Invalid Arrest Warrant*

The defendant asserts that his arrest was invalid because the Georgia parole warrant was stale since Georgia waived its right to enforce the warrant. The defendant contends that the arrest, based on the stale warrant, was pretextual, thus, unconstitutional. The defendant concedes these issues were addressed by this court in *State v. Langley*, 94-326 (La.App. 3 Cir. 4/14/94), 635 So.2d 784, and by the supreme court in *Langley I*, 711 So.2d 651, and "accepts this court is bound by the Supreme Court's earlier ruling . . . but reurges this assignment of error for record purposes."

In *Langley*, 635 So.2d 784, the defendant, pretrial, sought review of the trial court's denial of his motion to suppress. This court held, in pertinent part:

> The trial judge ruled that the Georgia parole violation warrant on which the Louisiana law enforcement authorities relied to arrest the defendant was valid. The parole violation warrant was not stale, and its execution was not unreasonably delayed. The delay in execution of the defendant's parole violation warrant was not seventeen months, as the defendant alleges, but much less; defendant's whereabouts were not known from September of 1990 until September of 1991, and from December 1, 1991 until his arrest on February 10, 1992. The Georgia and Louisiana authorities knew the defendant's location for three months, at most, and after he moved out of his parents' home in December of 1991, defendant never tried to contact any parole officer about his new address. Furthermore, the actions of the Georgia authorities, initiating the process for transfer of parole supervision to Louisiana, did not vitiate the warrant or establish a waiver of Georgia's right to enforce it, since Louisiana was investigating the defendant and the transfer had not been officially completed. Until the transfer of the defendant's parole supervision had been completed, Georgia retained authority to execute the warrant. During this period, the defendant once again absconded

34

from supervision, never informing anyone about his new residence, and exhibited his inability to conform to conditions of parole. The defendant's actions and inactions had frustrated the attempts by both Georgia and Louisiana parole authorities either to transfer parole supervision or to execute the parole violation warrant. Therefore, there is no error in the trial court's ruling that the parole violation warrant was valid. *See Saunders v. Michigan Department of Corrections*, 406 F.Supp. 1364 (E.D.Mich.S.D.1976); *Peoples ex rel. Flores v. Dalshiem*, 66 A.D.2d 381, 413 N.Y.S.2d 188 (1979).

Since the police arrested the defendant pursuant to a valid parole violation warrant, once the defendant was informed of his *Miranda* rights and waived them, the police legally questioned him about the disappearance of Jeremy Guillory. *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). The policemen's actions in arresting the defendant were justified by an objective standard of probable cause to arrest arising from the parole violation warrant, and the subjective motive of the officers to question the defendant about a child's disappearance will not invalidate an otherwise legal arrest. *State v. Wilkens*, 364 So.2d 934 (1978); *United States v. Causey*, 834 F.2d 1179 (5th Cir. 1987).

*Id.* at 785.

Following his conviction of a capital offense, the defendant sought appellate review directly with the supreme court. One of the assignments of error was the denial of the motion to suppress. The supreme court held, in pertinent part:

*A. The Validity of the Arrest Warrant*

The Georgia parole violation warrant was validly issued in September of 1990, shortly after Langley left that state without permission. Defendant was arrested in Louisiana on the outstanding Georgia warrant in February 1992, about 14 months after the Georgia warrant was issued, and only a few days after the murder of Jeremy Guillory. The arresting officers told defendant that they were arresting him for the parole violation, but also that they wanted to question him about the missing child. They twice advised Langley of his *Miranda* rights, and he confessed almost immediately on simply being asked whether he killed the boy. After the officers again explained his rights, and after Langley again expressly waived them, he confessed in detail, and allowed police to videotape him as he confessed and led them to the boy's body. In all, Langley was advised of his rights no less than four times.

35

Langley argues that the parole violation warrant became invalid because Georgia waived its right to execute it. Parolees and probationers have due process rights concerning revocation of their paroles or probations. *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). However, these due process rights are less than those involved in an ordinary criminal prosecution. Id., 411 U.S. at 788-89, 93 S.Ct. at 1762-63; *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). An unreasonable delay in executing a parole violation warrant may violate a parolee's due process rights in some cases. *See State v. Savoy*, 429 So.2d 542 (La.App. 2d Cir.1983). However, this is not such a case.

Some courts have spoken in terms of "staleness" and "waiver" with regard to unreasonable delays in the execution of parole violation warrants. *See, e.g., Greene v. Michigan Dept. of Corrections*, 315 F.2d 546, 547-48 (6th Cir.1963); *United States v. Hamilton*, 708 F.2d 1412, 1414 (9th Cir.1983). However, the underlying rationale of waiver or staleness concepts is the deprivation of the parolee's or probationer's constitutional rights to due process. *See People ex rel. Flores v. Dalsheim*, 66 A.D.2d 381, 413 N.Y.S.2d 188, 192 (App.Div.1979); *Barker v. State*, 479 N.W.2d 275, 278-79 (Iowa 1991). To hold that a parole violation warrant becomes stale by the mere passage of time alone would be to reward an elusive parole violator for remaining unavailable. *Flores*, 413 N.Y.S.2d at 192 (delay of almost three years not a violation of due process); *Barker*, 479 N.W.2d 275 (four year delay not violation of due process); *Shelton v. United States Bd. of Parole*, 388 F.2d 567 (D.C.Cir.1967). In addition, waiver alone is not the proper rationale for invalidating a warrant, because waiver implies both a knowing relinquishment of a right, and the authority of a parole officer to relinquish that right on behalf of the state. *Flores*, 413 N.Y.S.2d at 192. *See also Saunders v. Michigan Dept. of Corrections*, 406 F.Supp. 1364, 1366-67 (E.D.Mich.1976) (noting that mere inaction does not amount to waiver).

Under a due process analysis, the length of time between the issuance and execution of a parole violation warrant is but one factor in determining its continuing validity. *Barker v. State*, 479 N.W.2d 275, 279 (Iowa 1991). A delay in execution must be unreasonable before due process is affected. *United States v. Fisher*, 895 F.2d 208, 210 (5th Cir. 1990); *United States v. Hill*, 719 F.2d 1402, 1405 (9th Cir. 1983); *State v. Newman*, 527 So.2d 1036-39 (La.App. 2d Cir. 1988). Factors in assessing reasonableness include (1) the state's diligence in attempting to serve the warrant; (2) the reason for the delay in serving the warrant; (3) the conduct of the parolee in frustrating service; and (4) actual prejudice suffered by the parolee as a result of the delay. *Fisher*, 895 F.2d at 210; *Barker*, 479 N.W.2d at 278-79.

We also note that the aim of the entire parole concept is "to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed." *Morrissey*, 408 U.S. at 477-79, 92 S.Ct at 2598-98. In accordance with this aim, parole authorities have inherently broad discretion in the supervision of parolees. *Id.* Parole authorities are not in a race against the clock to execute parole violation warrants. *United States v. Gernie*, 228 F.Supp. 329, 338 (S.D.N.Y.1964). Nor must arrest and revocation be an automatic or reflexive reaction to every violation. *Hamilton*, 708 F.2d at 1415; *United States v. Tyler*, 605 F.2d 851, 853 (5th Cir. 1979).

According to the record, including testimony adduced at two separate suppression hearings on this issue, in the time between the issuance of the warrant and its execution, Georgia authorities may have initiated a process which might eventually have led to transferring Langley's parole supervision to Louisiana authorities. Langley claims to have spoken with his Georgia parole officer, Ben Poole, who purportedly said they could "work something out." (However, the defendant did not subpoena Poole.) Also about this time, Elizabeth Clark, the Louisiana parole agent, was in communication with Georgia authorities through her office. At their request, she verified that Langley was residing at his parents' home in Louisiana. Though Clark had no official authority to supervise Langley, she attempted to maintain contact with him unofficially. However, in November of 1991, without any transfer having been accomplished, Langley stopped reporting to Clark. In December of 1991, he moved from his parents' house without informing Clark, who could not locate him. In fact, Langley was not finally located until after the murder, when Clark informed investigators of Langley's last known residence (his parents' house). The investigators matched Clark's description of Langley with the description given by the victim's mother and discovered he was living in the Lawrence house where the murder occurred.

Also in September of 1991, Langley asked Louisiana State Trooper Charles Jones to see if there was a Georgia warrant out for Langley. At a pre-trial hearing, Jones testified that he told Langley he would check for warrants, and that he advised Langley to get in touch with local parole authorities to see about getting his parole transferred to Louisiana. Jones also testified that the first time he checked the computer for a warrant he found none, but a few days later he checked again and did find the Georgia warrant. Jones further testified that when [sic] discovered the warrant, he went out to arrest Langley at Langley's work place, but could not find him there. Finally, Jones testified that when he did see Langley some time later, he assumed that Langley had probably reached an arrangement with the Georgia parole authorities, based on Jones's discussion with Langley when they first spoke in

37

September, as well as Jones's belief that Langley and his employer were attempting to contact Georgia authorities.

The court of appeal accurately summarized the matter when denying relief on Langley's motion to suppress:

> Louisiana was investigating the defendant and the transfer had not been officially completed. Until the transfer of the defendant's parole supervision had been completed, Georgia retained the authority to execute the warrant. During this period, the defendant once again absconded from supervision, never informing anyone about his new residence, and exhibited his inability to conform to conditions of parole. The defendant's actions had frustrated the attempts by both Georgia and Louisiana authorities either to transfer parole supervision or to execute the parole violation warrant.

*State v. Langley*, 94-00326 (La.App. 3d Cir. 1994); 635 So.2d 784, 785.

Under these circumstances, Langley's due process rights were not violated. First, law enforcement authorities were reasonably diligent in attempting to serve the warrant. Langley's whereabouts were simply not known or easily ascertainable from September 1990 to September 1991. Second, the Georgia authorities had a valid reason for delaying the execution of the warrant while attempting to transfer parole. Instead of having Langley arrested immediately in September of 1991, they exercised their discretion in attempting to fulfill the aims of the parole concept. They did not "waive" their right to execute the warrant, nor did they relieve Langley of his parole obligations. Any attempt at a transfer of parole was necessarily conditioned on Langley's cooperation. Third, Langley's own conduct frustrated service of the warrant. After no more than three months, and before any transfer of supervision could occur, Langley stopped his unofficial reports to Clark, and moved from his residence. Efforts to locate him had to begin anew. Fourth and finally, Langley cannot claim he was prejudiced by the delay in his arrest, partly because he was responsible for the delay, and also because he had no reasonable basis to expect that any parole transfer would proceed without adverse consequences to him if he did not do his part. A delay in execution of a parole violation warrant may frustrate the violator's due process rights if the delay undermines his ability to contest the violation, or to proffer mitigating evidence. *United States v. Tippens*, 39 F.3d 88, 90 (5th Cir. 1994). These elements of prejudice are not present in this case.

In addition, we note that the defendant claims that only *Georgia* waived its right to execute the warrant. The Louisiana arresting authorities confirmed the existence of a facially and objectively valid

warrant and relied in good faith upon on it. Even if we decided that there were problems with the warrant, which we do not, we would not be inclined to apply the exclusionary rule against those acting in good faith on a facially valid warrant. *See United States v. Leon*, 468 U.S. 897, 918-19, 104 S.Ct. 3405, 3418, 82 L.Ed.2d 677 (1984). *Cf. also United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (police may act on wanted bulletins issued by police departments possessing probable cause or reasonable suspicion to have the defendant seized).

### B. The "Pretextual" Arrest

The officers who arrested Langley did so under the authority of a valid warrant. Thus, their subjective intent to examine defendant about the murder is not significant. "Subjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional." *Scott v. United States*, 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). The relevant principle of *Scott* is that "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987) (citing Scott ). Like Langley, the defendant in *Causey* sought to have his confession suppressed because he was arrested under a warrant for one crime, but questioned about another. *Causey*, 834 F.2d at 1180. The Fifth Circuit noted that the rule of suppression exists "to deter *unlawful* actions by police. Where nothing has been done that is objectively unlawful, the exclusionary rule has no application." *Causey*, 834 F.2d at 1185 (emphasis in original). Therefore, even though the police suspected that the defendant was involved in the disappearance of Jeremy Guillory, the arrest was nonetheless proper because they had an objective reason to arrest him for violation of his Georgia parole. *See also Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (allowing pretextual warrantless arrests based on probable cause).

Finally on the suppression issue, when the defendant was arrested, the officers properly explained his *Miranda* rights to him. He indicated he understood his rights and confessed to killing Jeremy Guillory. He was subsequently advised of his rights no fewer than three more times, and he waived his rights each time. His confession was voluntary and untainted by any form of coercion or undue influence. There is, therefore, no basis for suppressing the confession or any other evidence seized pursuant to defendant's arrest.

*Langley I*, 711 So.2d at 669-671.

We are bound to determine if the warrant is valid based on a review of the particular facts of the case and the applicable law. As the circumstances surrounding the arrest and the admission of evidence obtained as a result of that arrest are no different now than when they were reviewed by the supreme court in *Langley I*, we must follow the supreme court's opinion which applied the same law to the same facts. The arrest was not illegal, and there was no basis to suppress the confession or any other evidence seized pursuant to that arrest.

*C. Authority to arrest under La.Code Crim.P. art. 213(4)*

The defendant argues the peace officers lacked authority under La.Code Crim.P. art. 213(4), to arrest him.[1] Article 213 allows a peace officer to make an arrest without a Louisiana warrant in limited circumstances. It states, in pertinent part:

> A peace officer may, without a warrant, arrest a person when:
> . . . .
>
> (4) The peace officer has received positive and reliable information that another peace officer from this state holds an arrest warrant, or a peace officer of another state or the United States holds an arrest warrant for a felony offense.

At the hearing on the motion to suppress, the defendant argued, in pertinent part:

> [T]hey weren't authorized to arrest him on a parole warrant. If it would have been a felony arrest out in Georgia, they would have been authorized to arrest him in Louisiana without a Louisiana warrant. . .
>
> So the code [referring to art. 213 section 4] says you can arrest someone when you know there's an out of state warrant, as long as it's a warrant for felony arrest--felony offenses.

---

[1] Defendant does not challenge that his parole violation stemmed from a felony conviction.

And so the issue is, is a Georgia parole violation warrant . . . an arrest warrant for a felony offense.

In support of his assertion, the defendant cited *Green v. State*, 642 S.E.2d 167 (Ga.App. 2/9), *cert. denied*, (Ga.2007). In *Green*, the defendant had been convicted of two felonies and sentenced to three years in prison. After being released on parole, he was arrested for violating his conditions of parole. While being held in jail awaiting his hearing on the parole violation, he attempted to escape. Green pled guilty to attempted escape. He was sentenced to a felony sentence of five years. On appeal, Green asserted that the trial court erred in imposing a felony sentence when he pled to a misdemeanor. Green argued that the trial court misconstrued the statute in finding that he escaped after he had been "'convicted of a felony.'" *Id*. 168. Green explained that when he attempted to escape he was being held in jail for an alleged parole violation. Green concluded that as result he should have been sentenced for misdemeanor attempted escape. The *Green* court agreed, holding, in pertinent part:

> [A]t the time of the escape in this case, Green was in jail following his arrest on an alleged parole violation. He had not been charged with any other crime. Moreover, it is undisputed that there had been no hearing on Green's alleged parole violation, no determination that Green had, in fact, violated his parole, and no revocation of his parole prior to his escape attempt. Therefore, Green was in custody due to an alleged parole violation, not because he had been convicted of a felony.
>
> . . . .
>
> [I]t seems clear that Green was entitled to a hearing to determine whether he had, in fact, violated his parole and whether his parole should be revoked. Because no such hearing had been conducted at the time Green attempted to escape, Green's incarceration in the Screven County jail was based solely upon an *alleged* parole violation, not his prior felony convictions. See *Smith v. State*, 154 Ga.App. at 609, 269 S.E.2d 100. Accordingly, the trial court erred in imposing a felony sentence for Green's attempted escape.

*Id* at 169-171.

41

At the motion to suppress, the defendant in this case argued:

> [T]o the extent that the decision of the trial court or the appellate courts previously may have construed a Georgia pa[role] warrant as being a warrant for arrest for felony offense, we say that this makes it clear that is not the state of Georgia law.

The defendant's attorney clarified that neither this court nor the supreme court "explicitly use the words, 'we hold that a Georgia warrant is a felony arrest warrant' . . . But if it's not then [sic] there was no authority to arrest, so they must have found that." The defendant's attorney argued because the holding in *Green* created doubt as to the correctness of the earlier rulings, this was an exception to the "law of the case" doctrine. Additionally, he asserted *Green* was an intervening case.

At the hearing on the motion to suppress, the state responded, in pertinent part:

> I find it interesting that Georgia can issue a parole violation warrant on someone who has been convicted of felonies in another state and yet the officers of this state are powerless to act on it and allow him to go about his merry way.
>
> . . . .
>
> Well, they were acting in good faith, which has been ruled upon. The argument was that it was a pretextural arrest. And the Supreme Court has said not so, that they acted in good faith on the warrant that was there at the time, they did not take any action until they saw there was a warrant.
>
> . . . .
>
> And Georgia law and -- Louisiana law is not the same as Georgia law. As I stated earlier there is an outstanding warrant for a parole violation of someone convicted of a felony in the State of Louisiana, law enforcement can do two things; ignore it or act. In this case they acted.
>
> And I think that no one can say that their actions were done in any other manner except what was required by law at the time and they did what they were supposed to do.
>
> As I indicated the Court did not find this pretextural, the Court found that this was -- the actions of the officers -- they supported both the Third Circuit and the Supreme Court in what they did.

The fact that there is some case that comes up 14 years later that says in the State of Georgia -- 'cause this may or may not be. This parole violation may or may not be a felony, I think would affect that in any way, Your Honor.

After reviewing *Green*, the trial court in this case denied the motion to suppress, holding there was insufficient reason to overturn the court of appeal and the supreme court that had previously ruled the arrest was lawful. We find *Green* to be inapplicable to the issue before us.

We now address the issue of whether or not La.Code Crim.P art. 213(4) encompasses an arrest on a warrant for a parole violation. *State v. Shaw*, 06-2467 (La. 11/27/07), 969 So.2d 1233, sets forth the applicable law when interpreting a statute, explaining, in pertinent part:

> [W]e begin our analysis with the proposition that the starting point in the interpretation of any statute is the language of the statute itself. *Johnson*, 03-2993 at 11, 884 So.2d at 575; *Theriot v. Midland Risk Insurance Company*, 95-2895 (La. 5/20/97), 694 So.2d 184, 186; *Touchard v. Williams*, 617 So.2d 885, 888 (La.1993). Our interpretation of the language of a criminal statute is governed by the rule that the articles of the criminal code "cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." LSA-R.S. 14:3; *State v. Skipper*, 04-2137, p. 3 (La. 6/29/05), 906 So.2d 399, 403. Further, although criminal statutes are subject to strict construction under the rule of lenity, *State v. Carr*, 99-2209, p. 4 (La. 5/26/00), 761 So.2d 1271, 1274, the rule is not to be applied with "such unreasonable technicality as to defeat the purpose of all rules of statutory construction, which purpose is to ascertain and enforce the true meaning and intent of the statute." *State v. Everett*, 00-2998, p. 12 (La. 5/14/02), 816 So.2d 1272, 1279, *quoting State v. Broussard*, 213 La. 338, 342, La. 15] 34 So.2d 883, 884 (La.1948) *See State v. Brown*, 03-2788, pp. 5-6 (La. 7/6/04), 879 So.2d 1270, 1280, *quoting Perrin v. United States*, 444 U.S. 37, 49 n. 13, 100 S.Ct. 311, 317, 62 L.Ed.2d 199 (1979) ("The general rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity applies when the court is uncertain about the statute's meaning and is 'not to be used in complete disregard of the purpose of the legislature.' "). Consequently, a criminal statute, like all other

statutes, should be interpreted so as to be in harmony with and to preserve and effectuate the manifest intent of the legislature; an interpretation should be avoided which would operate to defeat the object and purpose of the statute. *Brown*, 03-2788 at 6, 879 So.2d at 1280; *Broussard*, 34 So.2d at 884. What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. *State v. Williams*, 00-1725, p. 13 (La. 11/28/01), 800 So.2d 790, 800. Therefore, where the words of a statute are clear and free from ambiguity, they are not to be ignored under the pretext of pursuing their spirit. LSA-R.S. 1:4; *State v. Freeman*, 411 So.2d 1068, 1073 (La.1982).

*Id.* at 1242.

Although not directly on point, *Mitchell v. Windham*, 469 So.2d 381 (La.App. 3 Cir. 1985), lends guidance in interpreting La.Code Crim.P. art. 213. In *Mitchell*, the plaintiff sought civil damages against the sheriff and his insurer for false imprisonment. The trial court granted the plaintiff's motion for summary judgment finding false imprisonment. On appeal, the summary judgment was one of the issues challenged by the defendant. This court reversed the summary judgment finding, in pertinent part:

Concerning the facts of Mitchell's arrest, the extensive record contains considerable detail. Sheriff Windham testified at the March 1982 trial that on April 25, 1980, he received two phone calls from a sheriff in Oklahoma who advised him that the Oklahoma authorities had a felony warrant for Mitchell's arrest, that Mitchell was currently residing with his parents in Jena, Louisiana, and that the Oklahoma authorities wanted him to arrest Mitchell. Sheriff Windham told the Oklahoma authorities on each occasion that he would arrest Mitchell once he received a teletype from them. The teletype was received, confirming that the Oklahoma authorities had a felony warrant for Mitchell's arrest charging him with taking mortgaged property out of the state and disposing of it, a felony in Oklahoma, and Sheriff Windham then ordered deputies Smith and Ashley to arrest the plaintiff.

Deputies Smith and Ashley testified that they arrested the plaintiff on April 25, 1980, on the instructions of Sheriff Windham. They stated that they advised plaintiff of his rights at arrest and that he was being arrested based on a felony warrant. Deputy Smith then further testified that Mitchell was advised of his rights again when he was booked in jail at 11:05 A.M. on that date.

44

Mitchell testified that when he was arrested the deputies advised him he was being arrested based on a warrant from Oklahoma, although they did not know the charge, and that Deputy Smith read him his rights. Plaintiff was informed of the charge the afternoon of his arrest.

\* \* \*

As this court stated in *Johnson v. State through Dept. of P. Safety*, 451 So.2d 104 (La.App. 3 Cir.1984), *writ denied*, 457 So.2d 15 (La.1984):

> "False imprisonment occurs when one is arrested and restrained against his will by another who acts without a warrant or other statutory authority. It is restraint without color of legal authority. *Kyle v. City of New Orleans*, 353 So.2d 969 (La.1977); *Richard v. State, through Department of Public Safety*, 436 So.2d 1265 (La.App. 1st Cir.1983), *writ denied*, 441 So.2d 1223 (La.1983). If a police officer acts pursuant to statutory authority in arresting and incarcerating a citizen, there is no false arrest or imprisonment. *Kyle v. City of New Orleans*, *supra*."

\* \* \*

In the instant case the authority relied on by the appellants for arresting the plaintiff is derived from former C.Cr.P. art. 213, which provided in pertinent part:

> "A peace officer may, without a warrant, arrest a person when:
>
> > \* \* \*
>
> > "(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense although not in the presence of the officer; or
>
> > "(4) The peace officer has received positive and reliable information that another peace officer holds a warrant for the arrest."

The trial court evidently concluded that former C.Cr.P. art. 213(4) was limited to peace officers holding a warrant from the State of Louisiana. Appellant argues that the language, "another peace officer", as used in former C.Cr.P. art. 213(4), included peace officers from other states holding warrants from other states for arrest. We agree.

45

> Our opinion is that the amendment to Art. 213(4), which now provides "or a peace officer of another state", was merely intended to clarify the existing law, and was not intended to change the law.

*Id.* at 383-85.

Applying the principles for statutory interpretation set forth in *Shaw*, this court finds that La.Code Crim.P. art. 213(4), when it refers to "a peace officer of another state or the United States holds an arrest warrant for a felony offense," includes warrants for parole violations. That provision of the statute is plain and straight forward. It reflects the legislative intent to allow the arrest of a person when an arrest warrant has been issued by another state for a felony offense. If the defendant's interpretation was given effect, it would result in an unjust and absurd result. Based on a warrant from another state, it allows peace officers of this state to arrest persons *accused* of a felony offense in the other state (which is conceded by the defendant), but disallows a peace officer of this state to arrest a person *convicted* of a felony from another state, who has violated a condition of parole imposed in the other state.

Moreover, although not explicitly addressed, Louisiana courts have impliedly interpreted La.Code Crim.P. art. 213(4) to include parole warrants. As noted above, the defendant pointed out how this court and the supreme court must have done so in *Langley,* 635 So.2d 784 and *Langley I*, 711 So.2d 651. Additionally, in *State v. Barrett*, 408 So.2d 903 (La.1981), the defendant was arrested on a warrant for a federal parole violation. On appeal, the defendant challenged the seizure of the evidence, but did not challenge the authority to arrest him on a warrant for a federal parole violation. Furthermore, we find *no* statute or jurisprudence prohibiting a peace

46

officer of this state from arresting a defendant on the basis of a warrant issued by another state for a parole violation.[2]

Accordingly, we find this assignment of error lacks merit.

_____

[2]A Louisiana judge and a Louisiana parole officer (who has been transferred supervision of the parolee from the foreign state) may issue a Louisiana arrest warrant for an out-of-state parole violation. La.Code Crim.P. art. 269 allows a Louisiana judge to:

> [I]ssue a warrant for the arrest of a person in this state, prior to a demand for extradition in conformity with Article 263, when on the oath or affidavit of a credible person, taken before a judge or clerk of court, the person to be arrested is charged with:

> . . . .

> (3) Having been convicted of a crime in another state, and having escaped from confinement or having broken the terms of his bail, probation, parole, furlough, or reprieve.

Additionally, La.R.S. 15:574.8 allows a parole officer who has been transferred supervision of the parolee from the foreign state to issue an arrest warrant and provides in pertinent part:

> A. Incidental to the supervision of parolees, parole officers shall be deemed to be peace officers and shall have the same powers with respect to criminal matters and the enforcement of the law relating thereto as sheriffs, constables and police officers have in their respective jurisdictions. They have all the immunities and matters of defense now available or hereafter made available to sheriffs, constables and police officers in any suit brought against them in consequence of acts done in the course of their employment.

> B. If a parole officer has reasonable cause to believe that a parolee has violated or is attempting to violate a condition of his parole and that an emergency exists, so that awaiting action by the board under R.S. 15:574.7 would create an undue risk to the public or to the parolee, such parole officer may arrest the parolee without a warrant or may authorize any peace officer to do so.

At the hearing on the motion to suppress held in 1992, the Louisiana parole officer who was informally supervising Defendant was asked by Officer DeLouche if she could "have Mr. Langley arrested or, could I arrest him for parole violation."(95-1489, p. 3752.) She responded she had "no authority over Mr. Langley because he was not actually under my supervision, that he would have to contact the State of Georgia." (95-1489, p. 3752.)

The defendant asserts the March 26, 1992, videotaped statement should have been suppressed because the statement was taken in violation of the defendant's Fifth and Sixth Amendment rights.

After being indicted by the grand jury on April 11, 2002, for first degree murder, the defendant filed a motion to suppress his March 26, 1992 statement. A hearing was held on April 7, 2003, at which the trial court denied the motion. The defendant sought pretrial review in this court, and this court held no error in the trial court's ruling. *State v. Langley*, an unpublished writ bearing docket number 03-463 (La.App. 3 Cir. 4/17/03).

In April 2003, the defendant was convicted of second degree murder. As noted above, on appeal, this court reversed the conviction, thus the issue was not addressed. *Langley II*, 896 So.2d 200.

When the pretrial process began again, the defendant did not re-urge the motion. As noted above, a motion to suppress should be filed pre-trial. La.Code Crim.P. arts. 703 and 521.

During the November 2009 trial, the state sought to introduce and show the trial court the March 26, 1992 videotaped statement. The defendant's attorney responded, "No objection, subject to all previous objections that have been made." However, the defendant did not re-urge the motion to suppress or articulate a basis for suppression of the March 26, 1992 videotape. In *State v. Aymond*, 08-1292, p. 14 (La.App. 3 Cir. 4/1/09), 8 So.3d 795, 803, this court explained: "A defendant seeking review of a motion to suppress on appeal is limited to the grounds articulated at trial. *State v. Johnson*, 389 So.2d 372 (La.1980); *State v. Bass*, 595 So.2d 820 (La.App. 2 Cir.), *writ*

*denied*, 598 So.2d 373 (La.1992)." *See also*, *State v. Moore*, 38,444 (La.App. 2 Cir. 6/23/04), 877 So.2d 1027, *writ denied*, 04-2316 (La. 2/4/05), 893 So.2d 83. Consequently, this court finds this issue was not properly preserved at trial, and the assignment of error is without merit.

**ASSIGNMENT OF ERROR NUMBER TEN:**
**RECUSAL OF JUDGE CARTER**

The defendant asserts that his "state and federal constitutional rights were violated when the randomly allotted judge assigned to these proceedings was removed at the insistence of the state pursuant to a meritless recusal motion." Trial by jury was waived when the case was assigned to Judge Wilford Carter. The state filed a motion to recuse the judge due to what was alleged to have been public and harsh criticism by Judge Carter of key state witnesses and an expressed public unwillingness to accept or believe the testimony of either witness. Judge Carter denied the motion, and the state took a writ to this court. This court reversed Judge Carter's ruling and remanded the matter for consideration by a different judge. *State v. Langley*, an unpublished writ bearing docket number 08-1189 (La.App. 3 Cir. 10/8/08).

The matter went before Judge Todd Clemons, who also denied the motion to recuse Judge Carter from the case. The state then took a second writ to this court. This court granted and made peremptory the state's writ, as follows:

> The trial judge found: 1) that the judge sought to be recused made derogatory statements against two law enforcement officers who will potentially appear as witnesses; 2) one of the witnesses is critical to the State's case; 3) that the judge sought to be recused previously made a statement that if either of these two officers were to testify, he should recuse himself; 4) that the only issue as to this statement was whether it had been made on the record in a prior civil case or off the record in the judge's office, or by telephone; 5) that if Chief Dixon, Detective Cormier, or Detective Delouche were on trial, the judge would not be deemed fair and impartial; 6) that the judge sought to be recused and Chief Dixon had a disagreement; 7) that the judge sought to be recused

49

had personal animosity toward Detectives Cormier and Delouche; and 8) that the State had valid concerns as to the judge's ability to preside without bias or prejudice.

Detective Delouche and Chief Dixon are potentially critical witnesses to the State's case. Detective Cormier was involved in the investigation and handled significant evidence. Although he did not testify at the two prior trials, to conclude that his testimony will not prove indispensable to the State is to impose a chilling, pre-trial burden on the State to decide whether the witness should testify.

These facts, as stated by the trial judge, standing alone, meet the burden of proof necessary to require recusal pursuant to La.Code Crim.P. art. 671(A), regardless of whether the trial will be by jury or judge. However, the trial judge incorrectly held that the burden of proving bias or prejudice is the same, regardless of the nature of the trial. We previously recognized that the burden of proof relevant to recusal is different, dependant upon whether the trial is by jury or judge. *State v. Willis*, 05-218 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, *writ denied*, 930 So.2d 973 (La. 6/23/06), *cert. denied*, 127 S.Ct. 668 (2006), citing *State v. Littleton*, 395 So.2d 730 (La.1981) and *State v. Manning*, 380 So.2d 54 (La.1980).

Additionally, if the judge sought to be recused would be presumed to be biased or prejudiced were Chief Dixon, Detective Delouche, and Detective Cormier on trial, he must be presumed to bear the same bias and prejudice when they could be key witnesses in a case to be tried before him. For the reasons stated, the State's writ application is granted, and it is hereby ordered that the judge presently scheduled to preside in the case before the court, is recused. The case is remanded for further proceedings consistent with this ruling.

*Langley*, 08-1413. The defendant then took a writ to the supreme court, which was denied. *State v. Langley*, 09-386 (La. 5/15/09), 8 So.3d 571.

The defendant points to a contemporary case wherein the state took a writ on Judge Clemons' denial of the state's motion to recuse Judge Carter based on similar allegations of bias as in the present case, including alleged animosity toward one of the officers discussed above. This court reversed Judge Clemons ruling and ordered the recusal of Judge Carter. The defendant points out that the supreme court reversed this court's ruling for the reason that the state failed to meet its burden of proving that

50

recusal was warranted and remanded to this court for consideration of pretermitted errors. *See State v. Wilkins*, an unpublished writ bearing docket number 08-1461 (La.App. 3 Cir. 4/24/09), and *State v. Wilkins*, 09-1124 (La. 6/5/09), 9 So.3d 859. The defendant asks this court to revisit the issue.

This court has explained that a defendant may seek review of a pretrial ruling even after the denial of a pretrial supervisory writ application seeking review of the same issue. When a defendant does not present additional evidence on the issue after the pretrial ruling, however, the issue can be rejected on appeal. Judicial efficiency demands that this court accord great deference to its pretrial decision unless it is apparent that the determination was patently erroneous and produced unjust results. *State v. Chambers*, 99-678 (La.App. 3 Cir. 1/19/00), 758 So.2d 231, *writ denied*, 00-551 (La. 9/22/00), 768 So.2d 600.

The defendant fails to offer sufficient additional evidence on the issue. The argument of why it was error to have recused Judge Carter remains the same. The defendant only points to the supreme court's remand of *Wilkins*, 9 So.3d 859, for consideration of pretermitted errors as a reason for this court to reconsider its ruling in this case. Ultimately, this court determined that Judge Clemons, whose denial of the motions to recuse Judge Carter was the issue in both the current case and in *Wilkins*, used the wrong standard for recusal in cases where the judge sits as the trier of fact (as he did in the current case) from that where he presides over a jury trial and remanded *Wilkins* to another judge for determination of whether Judge Carter should be recused. *Wilkins*, 08-1461.

51

Accordingly, the defendant does not show that this court's ruling in *Langley*, 08-1413, was patently erroneous and produced unjust results. This assignment of error is without merit.

## CONCLUSION

Ricky Langley's conviction for second degree murder is affirmed. The case is remanded for the trial court to inform the defendant of the correct prescriptive period for filing an application for post-conviction relief pursuant to La.Code Crim.P. art. 930.8 by sending the defendant written notice within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

**CONVICTION AFFIRMED. REMANDED WITH INSTRUCTIONS.**